**The R.C. MAXWELL CO., Appellant,**

v.

**BOROUGH OF NEW HOPE, Appellee.**

**No. 83–1610.**

United States Court of Appeals, Third Circuit.

Argued March 7, 1984.

Decided May 24, 1984.

Rehearing and Rehearing In Banc Denied July 3, 1984.

\* Honorable Walter E. Hoffman, United States District Judge for the Eastern District of Virgin-

David H. Moskowitz (argued), Moskowitz, Zamparelli & Weiss, P.C., Langhorne, Pa., for appellant.

David L. Shenkle (argued), Eastburn & Gray, Doylestown, Pa., for appellee.

Before HUNTER, BECKER, Circuit Judges, and HOFFMAN,\* District Judge.

### OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal involves the concern of an historic township with large outdoor billboards. The owner of the billboards, The R.C. Maxwell Co. ("Maxwell"), alleges that the New Hope Borough Council violated Maxwell's first amendment right to free speech by asking the owner of the billboards' site, Citibank, N.A. ("Citibank"), to

ia, sitting by designation.

terminate Maxwell's lease and remove the billboards. Citibank complied, and Maxwell brought this action. The United States District Court for the Eastern District of Pennsylvania granted summary judgment in favor of New Hope. We will affirm.

## I

The two large billboards [1] at issue in this case have stood on the outskirts of New Hope since 1927. They occupied part of a 150 acre tract, largely undeveloped, that was purchased in 1978 by Ivanhoe Properties, Inc. ("Ivanhoe"), a subsidiary of Citibank. On May 26, 1978, Maxwell signed a one year lease with Ivanhoe for the right to maintain the billboards on the site, at an annual rate of $600. At the end of the one year term the parties did not execute a new agreement, but Maxwell continued to remit, and Citibank to accept, the stated rent, giving rise to a year-to-year tenancy. Relations between tenant and landlord remained undisturbed until August, 1981, when the Borough Council of New Hope determined that it wanted the billboards removed.

New Hope is an historic town that prides itself on its quaint atmosphere. For some years, the Borough Council had tried to draft an ordinance to prohibit large, off-site billboards, of which Maxwell's were the only example in town. At the July 27, 1981 council meeting, a more expedient solution to the billboard problem was suggested and approved: an informal request to Citibank, Maxwell's landlord, to remove the offending billboards voluntarily.

Bettylou Smith, Secretary-Treasurer and later Borough Manager of New Hope, sent the suggested letter on August 7 to Alan Rosenstein, vice-president of both Ivanhoe and Citibank. The letter politely but firmly suggested that Citibank remove the unsightly billboards. It went on to mention the pending billboard ordinance, and the possibility that Citibank might find itself subject to legal proceedings if the billboards remained where they stood.[2]

In the letter, Smith explained the sources of the Council's displeasure: "[N]ot only is this billboard incongruous to the ambience of the community, it further offends us by advertising business located outside of this community." In a follow-up letter, Smith pointed out that the billboards advertised a restaurant across the river in Lambertville, New Jersey, a Dansk Factory Outlet in New Jersey, a home furnishing store in Penns Park, Pennsylvania, and Windsor

---

1. The record is somewhat confused as to whether there were in fact two billboards, or one billboard carrying four advertisements. The precise number is immaterial to our analysis; for purposes of discussion, we will generally refer to "billboards" in the plural.

2. We reprint the full text of the letter:

We are writing to solicit your personal assistance in order to alleviate an ongoing situation in our community by a professional agreement rather than legal procedures.

If you would kindly address yourself to the area of the undeveloped Village II property that is situate [sic] at South River Road (Route 32) and the foot of New Street you will find that a large billboard has been installed and used for advertising for an indeterminate period of time.

We are hopeful that you may be able to prohibit further use of this billboard whenever current leases are expired, and able to have the billboard removed and vacated completely at that time. We doubt that Citibank has any interest in either the advertising or the fi-

nances from this billboard, and we are seeking a remedy for its removal as soon as possible.

At this time we are nearing ordination of a new zoning ordinance which would prohibit such advertising methods, and additionally are seeking Historic Recognition for our community on the national level. Should the Federal Department of the Interior become our regulating authority in the near future, the billboard would be required to be removed by that Agency.

In the interim, we felt a courteous request to you directly might prove more effective and less costly than seeking legal remedies. I am sure you are interested in being responsive to this community; and not only is this billboard incongruous to the ambience of the community, it further offends us by advertising business located outside of this community.

Your sincere interest in our problem is anticipated, and we thank you for whatever help you may be with the resolve of it.

App. at 85a.

Canadian, a popular whiskey. Smith wrote, "You can easily see why New Hope Borough is adamant regarding the removal of this billboard just in terms of the advertising which is clearly unrelated to our community or atmosphere, and is otherwise offensive in size and totally unrequired in a historic scenic village." App. at 84a.

Rosenstein, on behalf of Citibank, readily agreed to remove the billboards. As he explained later, "Citibank is concerned as to how it is seen by any community in which it owns land." App. at 54a–55a. More particularly, Citibank had plans to develop the 150 acre parcel, and knew these plans would someday require the cooperation of Borough officials. App. at 48a. Rosenstein has denied that any explicit *quid pro quo* was contemplated or suggested, but admitted that Citibank's desire to stay in the Council's good graces was certainly a motivating factor.

Shortly after receiving the follow-up letter from the Borough Council, Rosenstein wrote to Maxwell and requested that the billboards be removed by May 26, 1982, the end of the lease period. Maxwell refused to comply, despite repeated demands by Citibank, and May 26 came and went without any change in the billboards' status.

On June 25, 1982, Maxwell brought this action against New Hope, alleging violations of Maxwell's free speech and due process rights, together with a pendent state claim for tortious interference with a contractual relationship. Maxwell sought punitive and compensatory damages, a declaration that the Borough Council acted unlawfully in "coercing" Citibank to evict Maxwell, and a permanent injunction directing Borough officials to cease from further interfering with the billboards.

Citibank, not a party to the federal action, brought suit in Pennsylvania state court to remove the holdover billboards. On Maxwell's motion, this action was removed to federal court and consolidated with Maxwell's suit against New Hope. All parties moved for summary judgment.

The district court granted summary judgment against Maxwell in both actions,

and ordered Maxwell to remove the billboards within 15 days. Maxwell obeyed, and does not here contest Citibank's right to eject the billboards at the expiration of the lease period. Maxwell does contest the grant of summary judgment in favor of New Hope. Because we do not believe that the Borough Council's actions "coerced" Citibank, we will affirm the order of the district court.

## II

■ Maxwell concedes that Citibank, as landowner and landlord to Maxwell, had the right to have the billboards removed at the end of the leasehold period. The first amendment is not ordinarily implicated when private actors design such restrictions on expression; indeed, in many instances the first amendment has been held to guarantee private actors the right to make such restrictions. *See Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

■ Maxwell contends, however, that Citibank's decision to remove the billboards was not reached privately and independently. Maxwell argues that the Borough of New Hope, by indirectly and informally exerting its sovereign power, coerced Citibank to order the billboards removed. This injection of government authority, Maxwell concludes, amounted to state-sponsored censorship of its billboard advertising.

Maxwell relies on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), in which the Supreme Court invalidated the practices of the Rhode Island Commission to Encourage Morality in Youth. The Commission's function was to review "any book, picture, pamphlet, ballad, printed paper or other thing" containing "obscene, indecent or impure language, or manifestly tending to the corruption of youth." *Id.* at 59–60, 83 S.Ct. at 633. The Commission was expressly

authorized to recommend criminal prosecution of any vendor found carrying objectionable material for sale to minors.

The Commission's practice was to distribute lists of objectionable books and magazines to booksellers and distributors, along with a request not to sell these publications to minors. The letter expressly threatened criminal prosecution of vendors who failed to cooperate: " 'The Chiefs of Police have been given the names of the aforementioned magazines with the order that they are not to be sold, distributed or displayed to youths under eighteen years of age. The Attorney General will act for us in case of non-compliance.' " *Id.* at 62 n. 5, 83 S.Ct. at 635 n. 5. Police officers would generally pay follow-up visits after each notice was distributed to learn what actions had been taken.

A Rhode Island book distributor, who had received at least 35 such notices as of the time of trial, testified that as a result he withdrew the objectionable publications from circulation and refused to place new orders. The trial judge found as a fact that " 'the effect of the said notices were [sic] clearly to intimidate the various book and magazine wholesale distributors and retailers and to cause them, by reason of such intimidation and threat of prosecution,' " to cease carrying the listed publications. *Id.* at 63–64, 83 S.Ct. at 635–36.

The Supreme Court ruled that the Commission's practices amounted to a scheme of state-sponsored censorship. The Commission argued in its defense that it could not be charged with regulating or suppressing obscenity, because it wielded no formal enforcement powers. The Court responded that informal government pressure can be as effective as formal legal proceedings in suppressing protected speech. "[T]hough the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its

aim." *Id.* at 67, 83 S.Ct. at 637. The Court stressed the trial judge's factual finding that distributors cooperated with the Commission only out of fear of prosecution. The Court's explanation bears quotation at length:

> People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around.... The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of listed publications *ex proprio vigore.* It would be naive to credit the State's assertion that their blacklists are in the nature of mere legal advice, when they plainly serve as instruments of regulation ....

*Id.* at 68–69, 83 S.Ct. at 638–39.

The appellant in our case, Maxwell, would have us equate the Borough Council's letters to Citibank with Rhode Island's systematic and "thinly veiled" regulatory scheme. This we decline to do. The quantum of governmental authority brought to bear against Citibank was far less than that faced by Rhode Island's booksellers. While the Commission in *Bantam Books* threatened criminal prosecution under existing criminal statutes, the Borough Council of New Hope could brandish nothing more serious than civil or administrative proceedings under a zoning ordinance not yet drafted. The Commission punctuated its letters with personal visits from uniformed police officers; the Borough Council only with additional correspondence. In short, we do not believe that New Hope's communications with Citibank can be read to have "coerced" Citibank, as that term was used in *Bantam Books. See Hammerhead Enterprises, Inc. v. Brezenoff,* 707 F.2d 33 (2nd Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (letters from state official asking stores not to carry objectionable board game held not coercive).

This conclusion is amply supported by the deposition testimony of Alan Rosen-

stein, the Citibank vice-president who dealt with the Borough Council and who ordered the billboards removed. In marked contrast to the book distributor who testified in *Bantam Books*, Rosenstein stated that his decision to remove the billboards, while prompted by the Borough Council's letters, was entirely voluntary. App. at 42a. Rosenstein denied having felt coerced or intimidated by the Council's actions. App. at 74a.

Maxwell suggests, however, that the coercion in this case was of a subtler variety than in *Bantam Books*. Maxwell accuses the Borough Council of playing on Citibank's desire to develop the 150 acre billboard site, and intimates that Citibank readily traded Maxwell's right to expression in exchange for a green light on the bank's proposed development. Rosenstein has denied that any such exchange was ever contemplated, and the record reflects that negotiations regarding the development did not take place until a year and a half after Citibank first agreed to remove the billboards.

Rosenstein has admitted that one factor in his decision was a desire to secure the good graces of the Borough Council. But we cannot attach to such a nebulous desire the constitutional significance Maxwell advocates. New Hope's letters to Citibank, devoid as they were of any enforceable threats, amounted to nothing more than a collective expression of the local community's distaste for the billboards. Businesses are naturally sensitive to their images in the community. If we were to apply constitutional standards to every private action intended to conform to civic sentiment, we would erode the ambit of private action

greatly. We conclude that Citibank's desire to create a receptive climate for any future development plans does not rise to the level of state-coerced action.

Because we rule that New Hope did not coerce Citibank to accede to its wishes, we do not reach Maxwell's substantive first amendment claim that the Borough Council was motivated by impermissible, content-based distinctions.[3]

For the foregoing reasons, we will affirm the order of the district court granting summary judgment in favor of the Borough of New Hope.[4]

BECKER, Circuit Judge, dissenting:

I agree entirely with the legal principles enunciated by Judge Hunter in his Memorandum Opinion. I believe, however, that the record presents a genuine issue of material fact as to whether the removal of the billboards was the result of any state-coerced action.

I note that in Exhibit M–4, a letter of July 17, 1982, from Borough Manager Smith to Mr. Rosenstein, the following is stated:

> Would you kindly advise whether CITIBANK is in fact terminating the leases for this billboard? I know you have received additional inquiries regarding this piece of property, and this office would be the first to encourage a higher level of use for it. However, the removal of the billboard would be an initial step and positive statement for Citibank to make with this community, and I hope you will implement its removal at the earliest opportunity.

While this letter was written after Citibank requested Maxwell to remove the bill-

---

**3.** Whether a municipal government may bar advertising related to out-of-town businesses— as Maxwell claims new Hope tried to do here— is a difficult question. We note generally that content-based distinctions are more easily tolerated in the commercial speech context. *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 564 n. 6, 100 S.Ct. 2343, 2350 n. 6, 65 L.Ed.2d 341 (1980). More particularly, we note that a majority of the justices of the Supreme Court approved that portion of a municipal ordinance prohibiting off-site busi-

ness advertising, and that such a scheme would effectively bar all advertising by out-of-town businesses. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

**4.** Maxwell's complaint asserted an assortment of federal and state claims in addition to the central first amendment claim. We find no error in the district court's grant of summary judgment to New Hope on these claims.

boards and after suit was filed, in my view it would be admissible to characterize the tenor of the communications between the Borough and Citibank. This letter directly links the removal of the billboards to a receptive climate for and favorable action upon Citibank's future development plans for its real estate in the Borough. While plaintiff does not appear to have a strong case, I believe that this letter and other evidence adduced in discovery foreclose a summary determination that the removal of the billboards did not result from state-coerced action.[1]  Accordingly, I respectfully dissent.[2]

---

**1.** I do not think that the disclaimer of Mr. Rosenstein precludes recovery by the plaintiff. After all, Citibank is alleged to have been currying favor with the Borough. While a factfinding on a full-trial record that Citibank was in fact not coerced would be conclusive, Rosenstein's concession in and of itself cannot bind plaintiff Maxwell.

**2.** I recognize that my position logically requires me to reach the question reserved by the majority in footnote 3. I agree with Judge Hunter that the question is extraordinarily difficult. I do not view *Metromedia* as conclusive. Moreover, I note that the record admits of the possibility that the Borough sought removal of the billboards for purely aesthetic reasons or for discriminatory reasons, a possibility that gives rise to other arguments by plaintiff. *Cf. Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (municipalities have a weighty, essentially aesthetic interest in proscribing intrusive and unpleasant formats for expression). I am not prepared on the basis of the present record and briefs to join the majority by resolving vexing substantive first amendment questions that are best left to another day.