Marshall RATTNER, Marshall Rattner, Inc. and National Limousine Service, Inc., and Professional Indemnity Agency, Inc., Plaintiffs,

v.

Malcolm NETBURN, John B. Farrington and the Incorporated Village of Pleasantville, Defendants.

No. 88 Civ. 2080 (GLG).

United States District Court, S.D. New York.

March 27, 1989.

Lidell, Sapp, Zivley, Hill & LaBoon and Cadwalader, Wickersham & Taft, New York City (David R. Kittay, David L. Noonan and John J. Walsh, of counsel), for plaintiffs.

Teitelbaum & Hiller, P.C., New York City (Herbert Teitelbaum, Richard J. Hiller, Roger Juan Maldonado, of counsel), for defendant Malcom Netburn.

Golenbock and Barell, New York City (Arthur M. Handler, Robert S. Goodman, Stanley A. Chinitz, of counsel), for defendants John B. Farrington and The Incorporated Village of Pleasantville.

## OPINION

GOETTEL, District Judge:

This action is yet another offshoot of the litigious relationship between the plaintiff, Marshall Rattner, and the various persons that serve as officers of The Incorporated Village of Pleasantville. Because an attempt to recapitulate the torturous procedural history of the multitudinous disputes between these parties could carry both author and reader well into the next century,

we will confine our analysis to the matters at hand.[1]

## I. FACTS

The briefly stated facts are as follows. On February 11, 1988, the plaintiff ran a paid advertisement in the *Pleasantville Gazette*, a Chamber of Commerce publication, entitled "Where Are Your Tax Dollars Going? For Litigation?". The advertisement assailed the Village of Pleasantville for what Mr. Rattner believed was a pattern of harassment against him and focused on the extensive legal fees incurred by the Village by virtue of its participation in the "Rattner litigation." The advertisement appeared in conjunction with an article on the front page of the *Gazette* that displayed the results of a poll conducted by the Chamber of Commerce.[2]

The advertisement and article were published in the midst of a local election in which Mayor Farrington and Trustee Netburn were running for reelection against the candidates of an opposing political party.[3] The Village Board of Trustees and Mayor Farrington learned of the advertisement prior to publication and discussed it in an executive session of the Board of Trustees on February 8, 1988. The Village later consulted with legal counsel on how to respond to the Rattner advertisement and counsel prepared an official response at the Board's request. At a meeting of the executive board on February 16, 1988, the Board decided not to issue the prepared response. On the morning of February 16, 1988, defendant Netburn dictated a letter to his secretary over the telephone from Logan Airport in Boston, Massachusetts

---

1. For a smattering of jurisprudence arising from the "Rattner litigation," see *Rattner v. Board of Trustees of the Village of Pleasantville*, 611 F.Supp. 648 (S.D.N.Y.1985); *Rattner v. Planning Comm'n of the Village of Pleasantville*, 548 N.Y.S.2d 1005 (2d Dep't 1989); *Rattner v. Planning Comm'n of the Village of Pleasantville*, 130 A.D.2d 654, 515 N.Y.S.2d 585 (2d Dep't 1987); *Rattner v. Planning Comm'n of the Village of Pleasantville*, 110 A.D.2d 840, 487 N.Y.S.2d 873 (2d Dep't 1985); *Rattner v. Planning Comm'n of the Village of Pleasantville*, 103 A.D.2d 826, 478 N.Y.S.2d 63 (2d Dep't 1984).

2. One poll question, for example, read as follows: "Pleasantville spends large amounts of money in legal fees. Do you believe this litigation is a good use of your tax dollars?" Appendix Volume 4 to Plaintiffs' Memorandum of Law, Exhibit 1.

3. Mayor Farrington and Trustee Netburn were running on the New Pleasantville Party ticket. Their opponents, Trustee McConnell and Trustee Kersten, respectively, were members of the Good Government Party. The plaintiff is neither a resident of Pleasantville, nor a member of either political party and has never run for elective office in the Village.

and had her sign and mail the letter to the Chamber of Commerce. The letter was written on his personal stationery and signed "Malcom Netburn." The letter expressed disapproval of the Chamber of Commerce for embroiling itself in a political controversy.[4] On March 2, 1988, at a televised public debate among the candidates for office, in response to a pointed question about the Netburn letter by a member of the audience, Netburn read the contents of the letter aloud.

The plaintiff contends that the Netburn letter was written and sent to the Chamber of Commerce at the Village's behest in lieu of an official response. The plaintiff further contends that the defendants' acts deprived the plaintiff of various constitutional rights and constituted tortious interference with contractual relations, intentional infliction of emotional distress and prima facie tort. All parties have moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden is on the moving party to demonstrate the absence of a material, factual dispute. Fed.R.Civ.P. 56(e); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If that burden is met, the non-moving party cannot simply rest on its complaint setting forth a valid cause of action. Fed.R.Civ.P. 56(e); *First Nat'l Bank v. Cities Services Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). It "must set forth specific facts showing that there is a genuine need for trial," Fed.R.Civ.P. 56(e), and there must be more than merely "some metaphysical doubt as to [those] material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In determining whether that burden is met, however, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). Discovery in this action has been completed and, judging from the volume of papers submitted on this motion, the court has before it most of the fruits of that discovery.

## III. DEFENDANTS FARRINGTON AND THE VILLAGE OF PLEASANTVILLE'S MOTION FOR SUMMARY JUDGMENT

Defendants Farrington and The Village of Pleasantville move for summary judgment on the grounds that the Village and Farrington did not direct Netburn to send the letter or otherwise participate in the alleged misconduct and that the plaintiff's state law claims are barred for failure to file a timely notice of claim.

### A. *State Action*

Principally, the defendants contend that Netburn acted alone in sending the letter to certain members of the Chamber of Commerce. Multiple citations to deposition testimony support the proposition that no one knew the terms or content of the Netburn letter prior to its being sent. Indeed, the only Pleasantville official who had advance knowledge that Netburn intended to write a letter was Mayor Farrington. On February 14, 1988, Netburn mentioned to Farrington in a conversation in a driveway that he was considering sending a letter to the Chamber of Commerce in response to the February 11th issue of the *Gazette*. Farrington denies knowing the proposed contents of the letter and contends that he merely responded that any decision by Netburn to write such a letter was a personal one. Finally, the defendants contend that on February 16, 1988, the Board of Trustees met in an executive session and decided not to respond to the Rattner advertisement. Thus, defendants Farrington and the Village argue that the undisputed facts demonstrate that they bear no responsibili-

---

**4.** The full text of the Netburn letter is reprinted *infra* at footnote 12.

ty for the Netburn letter and must be granted summary judgment.

In response, the plaintiff argues that the testimony adduced on various depositions permits an inference that the Village sanctioned and encouraged the sending of the Netburn letter. The voluminous papers offered by the plaintiff in opposition to the defendants' summary judgment motions and in support of its cross-motion for summary judgment often obfuscate rather than highlight the undisputed facts. For this reason, at oral argument we directed plaintiff's counsel to submit a brief letter specifically delineating the evidence supporting its claim of Village involvement in the Netburn letter.[5] Although the resulting letter was far from brief, we will enumerate the plaintiff's contentions contained therein in opposition to defendants' motion for summary judgment.

* On learning of the Rattner advertisement, the Village Board convened to discuss what to do in response.

* On or about February 4, 1988, the Board requested Village counsel to prepare a response to the Rattner advertisement.

* The Village Board never made an official or unofficial determination *not* to respond to the Rattner advertisement but never issued the response prepared by Village counsel.

* Village Administrator John St. Leger discussed the Rattner advertisement with Village counsel.

* At a meeting of the New Pleasantville Party election campaign group, attended by Mayor Farrington and Malcom Netburn, it was decided that certain party members, including Bernie Gordon who was the chairman of the Village Planning Commission, would either compose a letter or ask to speak to the Chamber of Commerce concerning the political nature of the poll and the

Rattner advertisement, would contact Chamber members and ask them to disavow their association with the *Gazette*, and would approach local shopkeepers who were distributing the *Gazette* to express their discontent.

* Village Administrator St. Leger spoke with various members of the Chamber of Commerce to express displeasure with the Rattner advertisement.

* Allegedly as a result of Planning Commissioner Chairman Gordon's discussions with Chamber members, certain members sent letters to Mayor Farrington apologizing for the *Gazette* and disassociating themselves from it.

* On February 14, 1988, Mayor Farrington and Malcom Netburn discussed whether Netburn would send a personal letter to the Chamber of Commerce.

* Immediately after dictating the letter to his secretary, Netburn placed a call to Village Hall at 10:54 A.M. At 11:12 A.M. a call was made by St. Leger, from Village Hall, to Village counsel Golenbock & Barell. At 11:15 A.M. St. Leger placed a call to Mayor Farrington.

* The content of the Netburn letter—specifically the use of the terms "the Village as a whole"—indicates that it was sent on behalf of the Village.

* After the letters were sent, Farrington stated in public that the letters were "mild and reasonable."

* Members of the Chamber of Commerce and a Village Trustee assumed the letter was actually written by Mayor Farrington.

* Facts discussed in the Netburn letter— namely that the Rattner advertisement "involves the Chamber in a difficult, ongoing legal situation"—were based on knowledge he gained as a trustee.

---

5. The extent of the Village's involvement is germane not only to its liability and the liability of Mayor Farrington but also to our jurisdiction over the plaintiff's claims. In the absence of proof of Village participation in the sending of the Netburn letter, the plaintiff will be unable to prove state action. Such a conclusion would

mandate dismissal of his claim arising under 42 U.S.C. § 1983 and, consequently, federal jurisdiction over his remaining claims would be lacking. As will be discussed *infra,* a final conclusion as to state action cannot be made on the present record.

* The phraseology of the Netburn letter resembles language contained in a Village newsletter item published in December 1985 which was written by St. Leger and Village attorneys.
* After receiving the letter, Chamber director Lois Kelly asked Netburn if Farrington was involved in sending the letter. Netburn neither admitted nor denied that Farrington was involved.

We harbor grave doubts that the plaintiff will be able to prevail on its theory of Village involvement in the Netburn letters. The proof of such involvement is paper thin and requires drawing inferences upon inferences. Although some elements of the plaintiff's proof strike us as absurd fabrication, others, when viewed cumulatively, might support an inference of state action. Were the Second Circuit's approach to summary judgment different, we would not hesitate to grant the defendants' motion on this record. In light of the appellate Pavlovian response to the grant of summary judgment, however, we will refrain from deciding this issue at this time. Fortunately, as the remainder of this opinion will demonstrate, resolution of the state action question is unnecessary.

### B. *Notice of Claim*

█ The defendants also move for summary judgment on the state law claims alleged in the complaint on the grounds that the plaintiff failed to file a timely notice of claim. Section 50–e of the New York General Municipal Law provides that the filing of a notice of claim against a municipality is a condition precedent to the commencement of an action based on state law. N.Y.Gen.Mun.Law § 50–e (1986); *accord Davidson v. Bronx Mun. Hosp.*, 64 N.Y.2d 59, 61–62, 484 N.Y.S.2d 533, 473 N.E.2d 761 (1984). In this action, the plaintiff filed a timely notice of claim that asserted claims against defendant Netburn both individually and in his official capacity. The notice of claim did not, however,

contain any allegations against either the Village of Pleasantville or Mayor Farrington.

"Failure to comply with provisions requiring notice and presentment of claims prior to the commencement of litigation ordinarily requires dismissal." *Davidson*, 64 N.Y.2d at 62, 484 N.Y.S.2d 533, 473 N.E.2d 761. Moreover, it is beyond our power to permit the plaintiff to now file a late notice of claim against these defendants. "As a matter of law [the court is] not authorized to grant leave to serve a late notice of claim upon an application pursuant to section 50–e of the General Municipal Law made after the Statute of Limitations for an action against the public corporation has expired." *Kral v. County of Westchester*, 101 A.D.2d 880, 476 N.Y. S.2d 353, 354 (2d Dep't 1984); *accord Cohen v. Pearl River Union Free School Dist.*, 51 N.Y.2d 256, 258, 434 N.Y.S.2d 138, 414 N.E.2d 639 (1980). Section 50–i of the General Municipal Law imposes a one year and ninety day statute of limitations on the commencement of tort claims against a municipality. N.Y.Gen.Mun.Law § 50–i (1986). Because the acts giving rise to the plaintiff's claims against the Village and Mayor Farrington took place more than one year and ninety days ago, we are powerless to grant the plaintiff's request to file a late notice of claim. Consequently, the defendants Village of Pleasantville and Mayor Farrington's motion for summary judgment on the state law claims contained the second, third and fourth causes of action of the Second Amended Complaint is granted.[6]

### IV. DEFENDANT NETBURN'S MOTION FOR SUMMARY JUDGMENT[7]

Defendant Netburn moves for complete summary judgment, raising numerous issues. We will consider each in turn.

---

**6.** The second, third and fourth causes of action allege intentional interference with business relationships, prima facie tort and intentional infliction of emotional distress, respectively.

**7.** The Village and Mayor Farrington join in defendant Netburn's substantive motion for summary judgment on the plaintiff's federal claim.

## A. *Netburn's First Amendment Rights*

Defendant Netburn's first contention is that the statements contained in his letter constitute political speech protected by the first amendment. Essentially, the defendant argues that his letter was a response to a politically charged debate initiated by the plaintiff during a campaign season and, as such, cannot form the basis of liability to the plaintiff. To reach the conclusion that the defendant is entitled to a free speech immunity, the defendant seeks to extend application of libel law principles to the civil rights allegations of this complaint. Specifically, the defendant contends that the Supreme Court's recent application of the libel standard created in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to a claim for intentional infliction of emotional distress, *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), warrants application of that standard to the civil rights claims herein.

In *New York Times Co. v. Sullivan,* the Court held that "a public official [is prohibited] from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. 725–26. This rule was later extended to public figures. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 154–55, 87 S.Ct. 1975, 1991–92, 18 L.Ed.2d 1094 (1967).[8] The most recent exposition of the "actual malice" standard occurred in *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

In *Falwell,* the nationally known minister Jerry Falwell sued Hustler Magazine for invasion of privacy, libel and intentional infliction of emotional distress as a result of the magazine's publication of an allegedly defamatory article and caricature. At trial, the district court granted a directed verdict in favor of the defendant on the invasion of privacy claim and the jury found for the defendant on the libel claim. The jury ruled for the plaintiff, however, on the intentional infliction of emotional distress claim, and it is this part of the action that made its way to the Supreme Court. Reiterating its concern for "robust political debate," *id.* at 51, 108 S.Ct. at 879, the Court held that

> public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with "actual malice," *i.e.,* with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a "blind application" of the *New York Times* standard, it reflects our considered judgment that such a standard is necessary to give adequate "breathing space" to the freedoms protected by the First Amendment.

*Id.* at 56, 108 S.Ct. at 882 (citation omitted). Thus, accepting the jury's finding that the *Hustler* parody was not believable and, therefore, not a false statement of fact, the Court concluded that the first amendment prevented Falwell from recovering on his claim for intentional infliction of emotional distress. *Id.* at 57, 108 S.Ct. at 882.

The defendant argues that the *Falwell* decision should be extended to encompass any civil action brought by a public figure challenging another's speech. In the defendant's view, "the constitutional protection of speech on public issues remains the same regardless of the nature of the claim asserted to remedy any alleged injury that resulted from such speech." Defendant Netburn's Memorandum of Law in Support of his Motion to Dismiss and/or for Summary Judgment at 39; *accord Dworkin v. Hustler Magazine Inc.,* 867 F.2d 1188, 1196 n. 5 (9th Cir.1989) ("Especially after *Falwell,* it seems likely that the require-

---

**8.** The definition of a public figure includes one who "by his purposeful activity [has] thrust[ ] ... his personality into the 'vortex' of an important public controversy." *Id.* at 155, 87 S.Ct. at 1991. There can be little dispute that the plaintiff has become a public figure in the arena of Pleasantville politics.

ment that the speech contain a false statement of fact applies not just to defamation claims, but to all claims seeking to impose civil liability for speech not otherwise outside the protection of the first amendment.") (dictum), *cert. denied,* — U.S. —, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989). Thus, the defendant concludes, because the Netburn letter did not contain any false statement of fact and was not written with "actual malice," the plaintiff is precluded from recovering for any of his alleged injuries.

■ We do not think that *Falwell* can easily be extended to the instant action. Unlike the parody at issue in *Falwell*, the plaintiff alleges not that he was injured directly by the contents of the Netburn letter but by the repercussions that followed. Nor does the plaintiff claim monetary damage resulting from an injured reputation. Rather, he claims that his own first amendment rights have been constrained. The clear preference for protected speech over reputation and monetary interests, present in *Falwell* and its predecessors, is not present in this action. We are faced, instead, with the competing first amendment rights of the parties. When there are constitutional rights on both sides of the scale, one party's rights must not be unfairly compromised. In short, we do not feel that *Falwell* can be applied wholesale to this case. While it certainly has bearing on the plaintiff's claim for intentional infliction of emotional distress, we cannot dispose of the plaintiff's civil rights claim quite so cavalierly.

### B. *Rattner's Constitutional Injury*

The plaintiff claims that he suffered numerous constitutional injuries including violations of the first amendment, the Equal Protection Clause and the Due Process Clause. The defendant seeks summary judgment on each of these claimed constitutional injuries.

#### 1. *Freedom of Speech*

The plaintiff's first claimed injury is that his free speech rights have been abridged because the *Gazette*—the plaintiff's preferred mode of communication—ceased publication as a result of Netburn's letter. We are faced, initially, with a factual dispute regarding whether the *Gazette* discontinued publication as a result of the Netburn letter. The plaintiff asserts, through the deposition testimony of Ben Lane, the individual primarily responsible for the *Gazette*, that the Chamber of Commerce thought it best to discontinue the *Gazette* as a result of the alleged economic and political fallout of the Netburn letter. Instead, a separate legal entity was established to publish a new newspaper called the *Pleasantville Chronicle*. Although the defendant vigorously disputes the plaintiff's version of the facts,[9] that dispute is largely irrelevant. Even if the plaintiff's version of the facts is accurate, his first amendment right to freedom of speech has not been infringed.

The first amendment does not grant upon the people an absolute right to speak in the private forum of their choice. *See Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974); *In re G. & A. Books, Inc.,* 770 F.2d 288, 299 (2d Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Midwest Video Corp. v. F.C.C.,* 571 F.2d 1025, 1054 (8th Cir.), *aff'd,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Avins v. Rutgers State University of New Jersey,* 385 F.2d 151, 153 (3d Cir.1967), *cert. denied,* 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968). In *Miami Herald,* rejecting Florida's "right of reply" statute, the Supreme Court determined that a newspaper could not be compelled to publish that which their reason dictated should not be published. *Miami Herald,* 418 U.S. at 256, 94 S.Ct. at 2839. "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." *Id.* at 258, 94 S.Ct. at 2840.

---

**9.** Indeed, the defendant points out that an issue of the *Gazette* was published in May 1988—three months after the events giving rise to this cause of action.

In short, the Court held that, although promoting public access to the media was a noble aim, interference with the autonomy of the press by compelled publication was as repugnant to the first amendment as governmental censorship. *Id.* at 260–61, 94 S.Ct. at 2840–41.

■ Following therefrom, it is clear that a newspaper could not be compelled to publish in the first instance if it chose not to. Whatever the reason for the discontinuance of the *Gazette,* its absence on the newsstand cannot be said to have deprived the plaintiff of his first amendment rights. Even though the *Gazette* will no longer be publishing the plaintiff's advertisements, other local publications are available and have, in fact, been utilized by the plaintiff to exercise his first amendment rights. The first amendment does not guarantee every person access to their medium of choice. *See In re G. & A. Books, Inc.,* 770 F.2d at 299 ("[T]he Constitution does not entitle a person to distribution of information in precisely the same form as that in use by the least expensive means of expression, as long as a comparable method is available."); *Midwest Video Corp.,* 571 F.2d at 1054 ("Every individual's right to speak, precious and paramount as it is, does not include every individual's right ... to speak in a non-public forum, like a newspaper."); *Avins,* 385 F.2d at 153 ("The right to freedom of speech does not open every avenue to one who desires to use a particular outlet for expression.").

The plaintiff nonetheless contends that its first amendment rights were trampled because the *Gazette* closed down as a result of governmental coercion. Apparently, the plaintiff looks to the case of *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) for support.[10] At issue in *Bantam Books* was the Rhode Island Commission to Encourage

Morality in Youth; an entity created by the Rhode Island Legislature to review "any book, picture, pamphlet, ballad, printed paper or other thing containing obscene, indecent or impure language, or manifestly tending to the corruption of the youth." *Id.* at 59, 83 S.Ct. at 633. The Commission was specifically empowered with the authority to recommend criminal prosecution of any vendor found carrying such materials. The Commission's practice was to distribute a list of allegedly obscene materials to booksellers and distributors with a specific request not to sell such items to minors. The letter accompanying the list expressly threatened criminal prosecution of vendors who failed to cooperate.[11] Recipients of the letter would then be visited by police to learn what action had been taken. *Id.* at 63, 83 S.Ct. at 635. The Court concluded that the state-sponsored program constituted a prior restraint on speech in violation of the vendors' constitutional rights. *Id.* at 70–72, 83 S.Ct. at 639–40. In so holding, the Supreme Court stressed the lower court's factual finding that vendors complied with the Commission's "requests" out of fear of prosecution.

> People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around.... The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore.* It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice, when they plainly serve as instruments of regulation independent of the laws against obscenity.

*Id.* at 68–69, 83 S.Ct. at 638–639.

■ We do not think Netburn's conduct can be equated to Rhode Island's "thinly

---

**10.** Although the plaintiff nowhere cites *Bantam Books* in his memorandum of law, he relies on *Hammerhead Enter. v. Brezenoff,* 707 F.2d 33 (2d Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983), which discusses *Bantam Books* at length.

**11.** The letter, quoted in part, stated that: "The Chiefs of Police have been given the names of the aforementioned magazines with the order that they are not to be sold, distributed or displayed to youths under eighteen years of age. The Attorney General will act for us in case of non-compliance." *Id.* at 62 n. 5, 83 S.Ct. at 635 n. 5.

veiled" regulatory scheme. In this action, Netburn had no authority to impose criminal or other sanctions on the Pleasantville Chamber of Commerce. The letters were not followed up with unannounced visits by police personnel. The letter contained none of the indicia of a prosecutorial instrument. Rather, the statements in the letter amounted to a plea to the Chamber of Commerce to rid itself of its political affiliations. This action is more akin to those at issue in *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir.1984), and *Hammerhead Enter. v. Brezenoff*, 707 F.2d 33 (2d Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983), than that in *Bantam Books.*

In *R.C. Maxwell*, the plaintiff alleged that the Borough of New Hope had violated his right to free speech by coercing a non-party to take down billboards on which the plaintiff had been leasing advertising space. The Borough Council had sent letters to the non-party urging it to remove the billboards because it found them offensive. The letter specifically referred to the possibility of legal action if the billboards were not removed. *R.C. Maxwell*, 735 F.2d at 86. The court, however, rejected the plaintiff's contention that the letter constituted state-sponsored censorship of his first amendment rights. As stated by the court:

> New Hope's letters to Citibank, devoid as they were of any enforceable threats, amounted to nothing more than a collective expression of the local community's distaste for the billboards. Businesses are naturally sensitive to their images in the community. If we were to apply constitutional standards to every private action intended to conform to civic sentiment, we would erode the ambit of private action greatly.

*Id.* at 89.

In *Hammerhead Enter. v. Brezenoff*, 707 F.2d 33 (2d Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983),

the Second Circuit rejected a similar attempt to label private action governmental censorship. The plaintiff in *Hammerhead* was a corporation that produced and marketed a board game entitled "Public Assistance—Why Bother Working for a Living." The advent of Public Assistance on the American market caused great public controversy over the alleged racism, sexism and derogatory stereotypes inherent in the game. Stanley Brezenoff, the Administrator of the Human Resources Administration of New York City, was particularly perturbed by the game and sent a letter to numerous retail outlets urging them to refrain from carrying Public Assistance. Brezenoff's letter lauded recent improvements in the welfare system and expressed his opinion that the game did " 'a grave injustice to taxpayers and welfare clients alike.' " *Id.* at 37 n. 2. Finally, the letter closed with the exhortation, "Your cooperation in keeping this game off the shelves of your stores would be a genuine public service." *Id.*

In rejecting the plaintiff's first amendment claim, the court characterized Brezenoff's letter as "nothing more than a well-reasoned and sincere entreaty in support of his own political perspective." *Id.* at 38. The court acknowledged that a cause of action can be stated when "comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Id.* at 39. Brezenoff's letter, however, referred to no adverse consequences and the Human Resources Administration had no power to impose sanctions on uncooperative merchants. Thus, the court concluded that Brezenoff's letter violated no first amendment rights. *Id.* at 40.

Similarly, Netburn's letter cannot be said to have violated the plaintiff's first amendment rights.[12] As in *Hammerhead* and

---

**12.** The letter, as sent to the members of the Board of Directors of the Chamber of Commerce, reads as follows:

Dear ———:

Myself and my neighbors wish to express our concern about the negative and political nature of the Pleasantville *Gazette.*

First, we were surprised by the anonymous back-page paid article, which appeared to be a

*R.C. Maxwell,* Netburn's letter was an expression of his frustration and disapproval of the Chamber of Commerce's involvement in the political arena. Unlike *Bantam Books,* the Netburn letter threatened no legal action or prosecutorial follow-up. Although the plaintiff characterizes the letter as threatening a boycott of local businesses, the language of the letter does not support such an interpretation. In the absence of language intimating legal reprisal, the plaintiff's claim of governmental coercion must fall. As stated by Judge Pollack in the initial decision of *Hammerhead:*

> A public official does not lose his unfettered right to express his opinion in nondefamatory words concerning the critical comments of zealots and others exercising like privileges by deed or word. The contra would put a silencer on the elected and selected leaders of the body politic. The Brezenoff letter was not censorship; it was an appeal to conscience and decency.

*Hammerhead Enter. v. Brezenoff,* 551 F.Supp. 1360, 1370 (S.D.N.Y.1982), *aff'd,* 707 F.2d 33 (2d Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). We agree and hold that the plaintiff has failed to establish a deprivation of his freedom of speech.

### 2. Freedom of Association

The plaintiff also claims that his right to freedom of association was impinged upon by the Netburn letter because members of the Village of Pleasantville and the Chamber of Commerce subsequently shied away from involvement with the plaintiff. Specifically, the plaintiff contends that the Chamber moved its meeting place out of Rattner's office and into the local fire station and that local business people refrained from associating with him for fear of governmental or economic reprisal. These allegations do not support a claim based on freedom of association.

The first amendment guarantee of freedom of association guards against undue intrusion by the state into the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). The constitutional protection afforded a particular organization is largely dependent on the nature of the association. "In determining whether a particular association is sufficiently

*Gazette* reporter's interview with Mr. Rattner. This "article" directly attacks the intentions and purposes of the Village as a whole, and its volunteer citizens who have tried to do what is right for our community. It involves The Chamber of Commerce in a difficult, ongoing legal situation.

We believe that its inclusion in a Chamber paper was and is inappropriate and a disservice to those of us who live here and have been strong supporters of our local businesses.

Secondly, several of the questions on your Page 1 questionnaire results are highly political and misleading in nature. On-site parking did not result in the construction of the building on Tompkins and Bedford Roads.

The question on legal fees is also biased and misleading. It is a leading question clearly asked to achieve a certain answer, not to establish objective facts.

It appears that The Chamber of Commerce has crossed the line between being a supportive, nonpartisan, and non-political local organization to one that has a political agenda and purpose. In that regard, I would appreciate hearing from you on the following questions:
1. Was the decision to run the paid, anonymous "article"—one that attacks our village— made by the entire membership of the organization?
2. Can we have a list of those members who supported the inclusion of this "article"?
3. Does The Chamber of Commerce have a political purpose? If so, what is that purpose?
4. Was the questionnaire reviewed and approved by the entire membership?
5. Who wrote the actual questions?
6. Are officially constituted members of The Chamber using their office to influence and/or support local political activities?

I believe that each citizen of Pleasantville deserves and expects answers to these questions. The healthy growth of many local businesses depends on the trust and honesty displayed by our local businesses and merchants to the Village as a whole. I believe—and many of my neighbors believe—that the recent *Gazette* raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends.

I would appreciate a reply at your earliest convenience.
Respectfully,
/s/Malcolm Netburn

personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Board of Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 546, 107 S.Ct. 1940, 1946, 95 L.Ed.2d 474 (1987). An unselective business association, for example, is entitled to less constitutional protection than an intimate family relationship. *Roberts*, 468 U.S. at 620, 104 S.Ct. at 1945.

■ The Pleasantville Chamber of Commerce is not a selective group. It is comprised of area merchants and encourages new businesses to join its ranks. The association is motivated by business concerns and, as such, is not on the highest echelon of constitutional protection. "Moreover, much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship." *Id.* at 621, 104 S.Ct. at 1946. In sum, the Chamber of Commerce is not an intimate association garnering considerable constitutional protection.

■ Additionally, the plaintiff has failed to demonstrate that the Netburn letter deprived him of his right to associate with Chamber members. It is uncontested that sometime after the Netburn letter was sent, the Chamber of Commerce moved its meeting place from the plaintiff's office to the local fire house. Indeed, deposition testimony of various Chamber members indicates that after the advent of the Netburn letter many thought it advisable to distance themselves and the Chamber from Mr. Rattner. Other deposition testimony, however, indicates that many Board members urged Mr. Rattner not to resign from the Chamber of Commerce. Indeed, Mr. Rattner did not resign and admits that he, or one or more of the corporations he controls, is currently a member of the Chamber of Commerce. In short, the plaintiff has not demonstrated that governmental action unconstitutionally abridged his right to freedom of association. Although certain Village members may have chosen to limit their interaction with the plaintiff after the Rattner/Netburn conflagration, neither Netburn nor the Village have prohibited the plaintiff from associating with whomever he pleases. The plaintiff has failed to demonstrate a cognizable constitutional injury based on freedom of association.

### 3. *Equal Protection*

■ The plaintiff also attempts to state a claim under the Equal Protection Clause. A person alleging equal protection violations must demonstrate that he is the victim of a class-based animus. *See Personnel Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *Mehta v. Surles*, 720 F.Supp. 324, 335 (S.D. N.Y.1989). The plaintiff has made no such allegation here. Unsupported references to the plaintiff's religion as the basis for the alleged discrimination will not make out a constitutional case. To the extent that the defendants have participated in a pattern of harassment of the plaintiff, they have done so for reasons other than Mr. Rattner's affiliation with any particular class. The Equal Protection Clause, therefore, is inapplicable.

### 4. *Due Process*

The plaintiff's final claim of constitutional injury is based on the Due Process Clause. The plaintiff alleges a substantive due process violation by virtue of the defendants' pattern of abuse and disregard for the plaintiff's constitutional rights. Specifically, the plaintiff claims that the defendants' conduct amounts to governmental oppression of his first amendment rights in contravention of the fourteenth amendment. When the plaintiff is not within the state's control, *i.e.*, a prisoner in state custody, "a constitutional violation is not generally found unless the government conduct is 'sufficiently severe, sufficiently disproportionate to the need presented and so deliberate and unjustified a misuse of [authority] as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights.'" *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir.1986) (citations omitted) (quoting *Shillingford v. Holmes*, 634 F.2d 263, 266 (5th Cir.1981)). No such showing has been made in this

case. Indeed, as the plaintiff's substantive due process claim is predicated on the alleged first amendment deprivations previously discredited, we cannot say that the plaintiff has suffered an independent constitutional violation. Consequently, the plaintiff's substantive due process claim must be dismissed.

### 5. *Conclusion*

None of the plaintiff's claimed constitutional injuries hold water. The plaintiff has been denied neither his freedom of speech nor his freedom of association. Nor has he alleged a cognizable injury under the Equal Protection or Due Process Clauses of the constitution. The Civil Rights Act only provides a remedy for violation of constitutional rights. *Tower v. Glover*, 467 U.S. 914, 919, 104 S.Ct. 2820, 2824, 81 L.Ed.2d 758 (1984); 42 U.S.C. § 1983 (1982). Thus, even were we to assume that state action was present, the plaintiff's civil rights claim would still be untenable. Our conclusion that none of the plaintiff's constitutional rights have been violated mandates dismissal of the plaintiff's first cause of action.[13]

This conclusion similarly requires dismissal of the plaintiff's claim that charges the defendants with participation in a conspiracy to violate his civil rights. 42 U.S.C. § 1985(3) (1982).[14] To make out a violation of section 1985(3), the plaintiff must allege four elements:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

**13.** The fifth cause of action asserts a claim for attorneys' fees under 42 U.S.C. § 1988 (1982). The dismissal of the first cause of action renders this claim moot.

**14.** Numerous readings of the Second Amended Complaint fail to reveal any mention of 42

*United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983). We have concluded that the plaintiff's allegations of misconduct do not rise to the level of constitutional deprivations. As such, it cannot be said that the defendants conspired to deprive the plaintiff of his constitutional rights. Thus, to the extent that a conspiracy claim is made, it must be dismissed.

### C. *Plaintiff's State Law Claims*

Having dismissed the first cause of action of the Second Amended Complaint containing the only substantive federal claim, we must now consider whether we retain jurisdiction over the plaintiff's remaining state law causes of action. The second cause of action states a claim for intentional interference with business relationships. The third cause of action alleges prima facie tort and the fourth cause of action alleges intentional infliction of emotional distress. The jurisdictional basis for these claims, prior to dismissal of the federal claim, was pendent jurisdiction. Despite dismissal of the federal claim, the defendants urge us to consider and dismiss the plaintiff's state law claims on the merits. This we decline to do. Although the retention of jurisdiction over the state law claims is within our power,

[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (footnote omitted). Thus, we elect to dismiss the claims asserted in the second, third and fourth causes of action as lacking jurisdictional basis.[15]

U.S.C. § 1985 (1982). Although certain paragraphs of the complaint refer to acts that may be loosely characterized as "conspiratorial," we fail to see any claim of a civil rights conspiracy. To guard against the possibility that we are misreading the complaint, however, we will address the merits of a conspiracy claim.

## V. PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

The plaintiff has cross-moved for summary judgment on the issue of section 1983 liability. For obvious reasons, that motion is denied.

## VI. CONCLUSION

For all the reasons stated above, the defendants' motions for summary judgment are granted and the plaintiff's complaint is dismissed in its entirety. The clerk will enter judgment for the defendants.

SO ORDERED.

---

15. By dismissing these claims, we are not relegating the plaintiff to a foreign forum. The plaintiff's state law claims are similar, if not identical, to claims already existing in state court.