FILED
United States Court of Appeals
Tenth Circuit

August 23, 2021

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

VDARE FOUNDATION,

    Plaintiff - Appellant,

v.

CITY OF COLORADO SPRINGS; JOHN
SUTHERS,

    Defendants - Appellees.

No. 20-1162

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:18-CV-03305-CMA-KMT)**

_____

Frederick C. Kelly, Law Offices of Frederick C. Kelly, Goshen, New York (Glen K.
Allen, Glen K. Allen Law, Baltimore, Maryland, with him on the briefs), for Plaintiff-
Appellant.

W. Erik Lamphere, Division Chief-Litigation, City Attorney's Office, Colorado Springs,
Colorado, for Defendants-Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

When the government speaks, what can it say? VDARE Foundation, Inc. alleges

that the City of Colorado Springs improperly spoke through a public statement issued by

its Mayor and, in so doing, violated VDARE's First Amendment rights. The public

statement, which was issued two days after the Charlottesville protests, denounced "hate speech" and relayed that the City wouldn't be providing municipal resources for VDARE's upcoming private conference in the City. The day after the Mayor issued the statement, a private resort in the City cancelled its contract to host VDARE's upcoming conference. VDARE alleges, under 42 U.S.C. § 1983, that the City's statement left the resort with no choice but to cancel the conference and thus (1) violated VDARE's rights to freedom of speech and freedom of association, (2) constituted First Amendment retaliation, and (3) tortiously interfered with VDARE's contract with the resort. The district court dismissed VDARE's federal claims for failing to state a claim. After that, it declined to exercise supplemental jurisdiction over the state tort claim. VDARE appeals. We affirm.

## BACKGROUND

### I.     Factual Background[1]

VDARE describes itself as a nonprofit organization that educates the public on two main issues: (1) the unsustainability of current U.S. immigration policy, and (2) the United States' ability to survive as a nation-state. VDARE carries out its mission through its website, books, public-speaking engagements, conferences, debates, and media appearances. It alleges that though it seeks to "influence public debate and discussion on the issues of immigration and the future of the United States as a viable nation-state," it

---

[1] These facts are largely derived from VDARE's First Amended Complaint. At this posture, they are accepted as true and viewed in the light most favorable to VDARE. *See Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

has "never advocated violence or any form of illegality." Appellant's App. at 7.

Around March 2017, VDARE reserved the Cheyenne Mountain Resort (the "Resort") in Colorado Springs for a future conference (the "Conference") featuring guest speakers and activities related to its mission. VDARE alleges that the Resort knew of VDARE's mission as well as the potential for media attention and possible protests that could arise from the Conference.

Over four months after VDARE booked the Conference, on August 12, 2017, violence erupted in Charlottesville, Virginia following a controversial political rally. The rally, protests, and ensuing violence drew national media attention. Two days later, on August 14, 2017, Mayor John Suthers, speaking on behalf of the City of Colorado Springs (the "City") (collectively, "Defendants"), issued the following public statement:

> The City of Colorado Springs does not have the authority to restrict freedom of speech, nor to direct private businesses like the Cheyenne Mountain Resort as to which events they may host. That said, I would encourage local businesses to be attentive to the types of events they accept and the groups that they invite to our great city.

> The City of Colorado Springs will not provide any support or resources to this event, and does not condone hate speech in any fashion. The City remains steadfast in its commitment to the enforcement of Colorado law, which protects all individuals regardless of race, religion, color, ancestry, national origin, physical or mental disability, or sexual orientation to be secure and protected from fear, intimidation, harassment and physical harm.

*Id.* at 8 (the "Statement").

The next day, August 15, 2017, the Resort issued a statement announcing that it would no longer be hosting the Conference and cancelled its contract with VDARE. In its Amended Complaint, VDARE doesn't allege that the City had any direct involvement

3

with the Resort's decision to cancel the Conference. Nor does it allege what, if any, reasons the Resort provided when it informed VDARE that it was cancelling the Conference. Rather, VDARE alleges that before the City's Statement, the Resort had been actively communicating and coordinating with VDARE about logistics and safety in connection with the Conference. Further, it alleges that sometime after the Resort cancelled the Conference, Mayor Suthers "publicly expressed satisfaction that the Conference had been cancelled." *Id.* at 9.

## II.      Procedural Background

In its Amended Complaint, VDARE asserts three claims against Defendants. First, under 42 U.S.C. § 1983, VDARE alleges that Defendants violated its rights to freedom of speech and freedom of association as guaranteed by the First Amendment and that they violated VDARE's equal protection rights as guaranteed by the Fourteenth Amendment.

Specifically, VDARE alleges that the City's "announcement that [it] would not provide any municipal resources or support of any kind, including basic police, fire, ambulance, parking and security services, meant that participants in the Conference, the Resort's patrons and employees, and innocent bystanders would potentially be subjected to serious injury or death in the event that they were threatened or attacked by protestors." *Id.* at 11. VDARE further alleges that the City "targeted" it under the City's "Hate Speech Policy," which was "not content-neutral either facially or in its application" and "targeted events, groups, and individuals for disfavored treatment based on the content of their speech." *Id.* From this, VDARE claims that it was "deprived of its ability to lawfully and peaceably assemble with its invited guest speakers, readers, supporters,

and other interested persons." *Id.*

Second, VDARE alleges that Defendants retaliated against it in violation of the First Amendment by characterizing its "constitutionally protected activity as 'Hate Speech,' and urg[ing] local businesses to 'be attentive to the types of events that they accept and the groups that they invite.'" *Id.* at 17–18. Here, VDARE again emphasizes the part of the City's Statement stating that the City would not "provide any support or resources to this event." *Id.* at 18. VDARE alleges that the City's decision "would chill a person of ordinary firmness from continuing to engage in this type of . . . activity." *Id.* And due to the City's "expressed disapproval" of VDARE's speech, VDARE claims that it hasn't attempted to arrange another conference in Colorado Springs. *Id.*

Third, VDARE alleges that Defendants intentionally interfered with its contract by "effectively ma[king] performance of the contract impossible." *Id.* at 19–20. On this point, VDARE claims that Defendants "were specifically aware of the Resort's contract with [VDARE]" and that Mayor Suthers later "expressed satisfaction that the Resort had cancelled its contract to host [the] Immigration Reform Conference." *Id.* at 19.

Based on these claims, VDARE seeks (1) compensatory, punitive, and "presumed" damages; (2) a declaration that "Defendants' conduct violated Plaintiff's First Amendment rights and intentionally interfered with their contract with the Resort"; and (3) an injunction "forbidding Defendants from denying municipal services to entities or events based on their controversial viewpoints and affiliations." *Id.* at 22.

Defendants moved to dismiss VDARE's Amended Complaint for failure to state a claim. The district judge referred this motion to a magistrate judge. The magistrate judge

issued a report and recommendation (the "Recommendation"), suggesting the district court dismiss all federal claims and decline to exercise supplemental jurisdiction over the state claim. Despite VDARE's objections to the Recommendation, the district judge adopted the Recommendation, further addressing an argument on "government speech" that VDARE insisted the magistrate judge had missed. Three days later, the district judge entered a final judgment, from which VDARE has timely appealed. We exercise jurisdiction under 12 U.S.C. § 1291.

III.    **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).

"We review de novo the [district court's] grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Gee v. Pacheco*, 627 F.3d 1178, 1183 (10th Cir. 2010) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility" if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at

6

556). A plaintiff must allege sufficient facts to "nudge[] [his] claims . . . across the line from conceivable to plausible." *Id.* at 680 (second alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "[I]t asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

Under the Rule 12(b)(6) analysis, we "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "When there are well-pleaded factual allegations" remaining, we "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (citation omitted), the court need not accept "conclusory allegations without supporting factual averments," *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citations omitted).

## DISCUSSION

VDARE raises two First Amendment claims and one state tort claim. Its first claim alleges a violation of its rights to freedom of speech and freedom of association. As we will discuss next, to successfully plead this claim through § 1983,

7

VDARE must plead that any allegedly unconstitutional conduct that injured VDARE was state action. VDARE's second claim is for First Amendment retaliation—a claim that hinges on satisfying several rigorous elements. We will address each of these two claims in turn and then address supplemental jurisdiction last.

## I.    Freedom of Speech and Freedom of Association Claim

VDARE's first claim is that Defendants, acting under color of law, intentionally deprived VDARE of its First Amendment rights to freedom of speech and freedom of association. According to VDARE, "Defendants' announcement that they would not provide any municipal resources or support of any kind, including basic police, fire, ambulance, parking and security services" deprived it of its First Amendment rights, which in turn caused VDARE to lose revenue from the planned Conference and resulted in negative publicity. Appellant's App. at 11, 13. VDARE also claims that the City's refusal to "provide any support or resources" has "made it impossible for VDARE to conduct future conferences, discussions and events in Colorado Springs," because Defendants have made clear that VDARE "enjoy[s] a disfavored status under the law." *Id.* at 13.

In addressing this claim, the Recommendation limited its analysis to whether the Resort's cancelling of the Conference could be considered state action. After noting that most rights in the Constitution are protected against infringement only by governments, the Recommendation concluded that VDARE hadn't alleged a sufficient nexus between the Resort's cancellation and the City's Statement for the Resort's conduct to be deemed state action. So it recommended that the district court

8

dismiss the claim.

In its objections to the Recommendation, VDARE argued that the Recommendation had failed to consider whether the City's Statement itself, if taken as a "threat" or a "warn[ing]" to "local businesses" not to contract with VDARE, could support the claim. *Id.* at 61. Otherwise stated, VDARE argued that the Recommendation focused only on whether the *Resort's* cancelling the Conference could be deemed a constitutional violation as opposed to the *City's* issuing the Statement advising that it wouldn't provide any support or resources for the Conference. *Id.* at 53.

In response, the district court separately assessed (1) the Resort's cancellation and (2) the City's Statement. First, it ruled that the Resort's cancellation was not plausibly pleaded as state action, because it contained no factual allegations that the City had coerced or significantly encouraged the Resort's decision. Second, it concluded that the City's Statement itself was permissible government speech under the "government-speech" doctrine and that the City was merely expressing that it "would not devote any support or resources to Cheyenne Resort, a private party hosting a private organization's event on private property." *Id.* at 90–91.

VDARE contends that the district court erred in two ways. First, it asserts that the district court failed to apply the correct formulation of the "nexus test" in determining whether VDARE had plausibly alleged state action. Second, it claims that the district court wrongly "separat[ed] the Cheyenne Resort's cancellation and the Defendants' statements into an artificial dichotomy" and didn't sufficiently

9

consider the importance of context. Appellant's Opening Br. at 12.

Defendants respond that (1) the district court correctly determined that VDARE hadn't plausibly alleged that the Resort's decision to cancel the Conference was state action, and (2) the City's Statement was "permissible government speech which in no way directed Cheyenne Resort to take any action." Appellees' Answer Br. at 3. For the following reasons, we agree with Defendants.

## A.    § 1983 and State Action

A claim pleaded under § 1983 requires "(1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (citation omitted). Because the second element requires an actor to act "under color of state law," "the only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." *Gallagher v. "Neil Young Freedom Concert,"*, 49 F.3d 1442, 1447 (10th Cir. 1995) (internal marks, brackets, and citations omitted). Therefore, to succeed on a § 1983 claim based on the Resort's cancellation, VDARE must plausibly allege that the Resort's decision to cancel the Conference amounts to state action. *See id.*

We have previously considered four tests delineated by the Supreme Court to determine whether private parties should be deemed state actors when conducting a state action analysis: (1) the nexus test, (2) the symbiotic-relationship test, (3) the joint-action test, and (4) the public-function test. *Id.* at 1448–57. Here, VDARE relies on the "nexus test," arguing that because the real message of the City's Statement

10

was "that the Cheyenne Resort should cancel VDARE's conference," the Resort's decision to cancel the Conference should be treated as state action. Appellant's Opening Br. at 13. We conclude that VDARE hasn't satisfied the nexus test.

### 1.    Legal Standards for the Nexus Test

Under the nexus test, a plaintiff must demonstrate "'a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" *Gallagher*, 49 F.3d at 1448 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). In other words, the City is responsible for the Resort's private decisions "only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [City]." *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). "The test insures that the state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains." *Id.* (citation omitted).

In *Gallagher*, we reviewed a number of general principles regarding the nexus test derived from Supreme Court cases. *Id.* at 1448. For instance, we noted that "the existence of governmental regulations, standing alone, does not provide the required nexus." *Id.* (citing *Blum*, 457 U.S. at 1004; *Jackson*, 419 U.S. at 350). We also noted that "the fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action." *Id.* (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 840–42 (1982); *S.F. Arts & Athletics, Inc. v. U.S. Olympic*

11

*Comm.*, 483 U.S. 522, 544 (1987)). Likewise, we explained that the "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.* (alteration in original) (quoting *Rendell-Baker*, 457 U.S. at 1004–05); *see also Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 54 (1999) ("[P]ermission of a private choice cannot support a finding of state action."). Similarly, we observed that a state's subsidizing the operating costs of a private facility or having broad involvement in the administrative side of a private process is also insufficient to satisfy the test. *Id.*; *see also Blum*, 457 U.S. at 1011; *Am. Mfrs. Mut. Ins.*, 526 U.S. at 54; *S.F. Arts & Athletics*, 483 U.S. at 544 ("The Government may subsidize private entities without assuming constitutional responsibility for their actions.").

In short, the following factors do not alone satisfy the nexus test: (1) state regulation of private functions, *Blum*, 457 U.S. at 1004; (2) state contracts with private entities, *id.*; (3) receipt of state funds or other types of assistance, *Rendell-Baker,* 457 U.S. at 840–42; (4) state approval of private decisions, *Am. Mfrs. Mut. Ins.*, 526 U.S. at 54; (5) state subsidization of private costs, *Blum*, 457 U.S. at 1011; (6) private use of certain state procedures, *Am. Mfrs. Mut. Ins.*, 526 U.S. at 54, and (7) broad involvement of state officials in the administration of private processes, *id.*; *Blum*, 457 U.S. at 1010. Though VDARE argues that "significant encouragement" short of coercion can sometimes satisfy the test, Appellant's Opening Br. at 15–16, the dispositive question is always "whether the State has exercised coercive power or has provided *such* significant encouragement, either overt or covert, that the choice

12

must *in law be deemed to be that of the State*." *Am. Mfrs. Mut. Ins.*, 526 U.S. at 52

(emphases added) (citations and internal quotation marks omitted).

### 2.    VDARE's Reliance on *Bantam Books v. Sullivan*

VDARE argues that "[t]he facts in this case closely resemble those in *Bantam*

*Books, Inc., v. Sullivan*, 372 U.S. 58 (1963)." Appellant's Opening Br. at 14. *Bantam*

*Books* considered state action in a state censorship context. There, a Rhode Island

commission had begun threatening distributors with legal sanctions unless they

suppressed publications that the Commission found objectionable. *See id.* at 15–18.

VDARE contends that, as in that case, the City's Statement—when considered in full

and in the context of the surrounding events—significantly encouraged the Resort's

behavior, thereby rendering the Resort's decision to cancel the Conference state

action. We disagree.

In *Bantam Books*, the Court reviewed the actions of an entity created by the

Rhode Island Legislature, namely, the "Rhode Island Commission to Encourage

Morality in Youth." 372 U.S. at 59. That Commission was responsible for reviewing

and educating the public about printed materials containing "obscene, indecent or

impure language, or manifestly tending to the corruption of the youth," as defined by

the State's general laws. *Id.* It was also authorized "to investigate and recommend the

prosecution of all violations of [the relevant] sections" of the State's general laws

and to "encourage morality in youth by (a) investigating situations which may cause,

be responsible for or give rise to undesirable behavior of juveniles, (b) educate the

public as to these causes and (c) recommend legislation, prosecution and/or treatment

which would ameliorate or eliminate said causes." *Id.* at 60 n.1.

Within this role, the Commission drew up lists of objectionable books and magazines on official Commission stationary, which it then provided to book or magazine distributors. *Id.* at 61. In addition, it served multiple notices that threatened criminal action against vendors who circulated the listed publications. *Id.* at 62–63.

Typical notices stated that the Commission had "reviewed" publications and "by majority vote" declared which ones were "completely objectionable" for sale, distribution, or display for youths. *Id.* at 62 n.5. The notices relayed that the "Chiefs of Police" had been given the names of the objectionable publications, and the notices reminded recipients of the Commission's duty to recommend to the Attorney General the prosecution of purveyors of obscenity. *Id.* The notices also stated that the Attorney General would "act" for the Commission in the case of "non-compliance." *Id.* Then the notices would thank recipients for their "cooperation." *Id.* After sending the notices, the Commission often had local police officers visit the distributors to learn what actions the distributors had taken to comply with the notices. *Id.* at 63.

The Supreme Court ruled that the Commission's system was unconstitutional and amounted to state-sponsored censorship. *Id.* at 72. The Court explained that though the Commission lacked authority to regulate or suppress content, it had done so anyway by using "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" to deliberately suppress publications deemed "objectionable." *Id.* at 66–67 (footnote omitted). The Court further noted that though the plaintiff was "'free' to ignore the Commission's notices, in the sense that his

14

refusal to 'cooperate' would have violated no law," his "compliance with the Commission's directives was not voluntary." *Id.* at 68 ("People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them . . . . The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulations of the listed publications.").

*Bantam Books* provides VDARE little help. In *Bantam Books*, the Supreme Court described the Commission's notices as "instruments of regulation" "phrased virtually as orders" that contributed to a "form of effective state regulation superimposed upon the State's criminal regulation of obscenity." *Id.* at 68–70. The Court found that the Commission's regulatory system (its notices, blacklists, police visitations, and implied criminal sanctions) "create[d] hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *Id.* The City's Statement differs markedly from such a system.

### 3.    *R.C. Maxwell v. Borough of New Hope*

About two decades after the Supreme Court's decision in *Bantam Books*, the Third Circuit applied that case to a situation in which the government had exerted deliberate pressure on a private party to terminate a private business relationship. In *R.C. Maxwell Co. v. Borough of New Hope*, a case on which Defendants rely, the plaintiff leased commercial billboards from Citibank in the Borough of New Hope, Pennsylvania. 735 F.2d 85, 86 (3d Cir. 1984). The billboards advertised alcoholic products as well as businesses located outside of the Borough. *Id.* at 86–87. Because

15

the Borough viewed itself as a historic town with a "quaint atmosphere," the Borough's Council grew frustrated by the billboards' content and size and sent several letters to Citibank. *Id.* at 86.

The letters advised Citibank that the Borough sought its "personal assistance" in removing the billboards at the end of their leases and that it hoped Citibank would do so by a professional agreement rather than through more expensive "legal procedures." *Id.* at 86 n.2. The letters also mentioned that though this was a "courteous request," the town was near enacting a zoning ordinance prohibiting such advertising and that a federal agency might also soon require the billboards' removal. *Id.* Unlike in *Bantam Books*, the letters contained no threats of criminal prosecution and expressed a clear desire to avoid legal proceedings. *See id.* And though the letters didn't say that the Council could proscribe the billboards' contents, their size, or Citibank's right to own them, they expressed the Council's strong desire for the billboards to be removed because of their "offensive" size and their "unsightly" content. *See id.* at 86–87.

After receiving the letters, Citibank agreed to remove the billboards, explaining that it was "concerned as to how it [was] seen" by the community in which it own[ed] land." *Id.* at 87 (citation omitted). Further, Citibank admitted that it wanted to stay in the "good graces" of the Council in case Citibank might later choose to develop land or engage in other business endeavors in the Borough. *Id.* (citation omitted). Citibank then repeatedly ordered the plaintiff to remove the billboards by the end of the plaintiff's year-to-year tenancy, but when the time came

to do so, the plaintiff refused. *Id.* So Citibank successfully sued the plaintiff in Pennsylvania state court to remove the billboards. *Id.* After that, the plaintiff sued the Borough in federal court, arguing under *Bantam Books* that the Borough had "coerced" Citibank into removing the billboards, which violated plaintiff's First Amendment rights. *Id.* Ultimately, the two cases were consolidated in federal court, and the court ruled against the plaintiff-lessee in both actions. *Id.*

On appeal, the Third Circuit affirmed the order granting summary judgment to the Borough for the alleged First Amendment violation. *Id.* In so doing, the court commented that, unlike in *Bantam Books*, the Borough's two letters were "devoid" of "any enforceable threats," and thus "amounted to nothing more than a collective expression of the local community's distaste for the billboards." *Id.* at 88–89. It further concluded that "[t]he [F]irst [A]mendment is not ordinarily implicated when private actors [impose] restrictions on expression; indeed, in many instances the [F]irst [A]mendment has been held to guarantee private actors the right to make such restrictions." *Id.* at 87 (listing cases).

Put simply, the Third Circuit acknowledged that private businesses may restrict private expression. *See id.* And it further noted that because businesses care about their public image, they may be *influenced* by public sentiment without being *coerced* by the government. *See id.* at 89 ("Businesses are naturally sensitive to their images in the community. If we were to apply constitutional standards to every private action intended to conform to civic sentiment, we would erode the ambit of private action greatly."). With this case juxtaposed to *Bantam Books*, we now assess

VDARE's argument that the City's Statement provided such significant encouragement as could satisfy the nexus test.

### 4.    Application of the Nexus Test to the Resort's Cancellation

VDARE argues that its situation is akin to that described in *Bantam Books*. Based on the cases above, we disagree. Unlike in *Bantam Books*, nothing in the City's Statement plausibly threatens the Resort with legal sanctions. Indeed, the first line of the Statement states the opposite: "The City of Colorado Springs *does not have the authority* to restrict freedom of speech, nor to direct private businesses like the Cheyenne Mountain Resort as to which events they may host." Appellant's App. at 8 (emphasis added).

We find that this sentence is more comparable to the communications in *R.C. Maxwell* and another case, *Penthouse International, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991), rather than to those in *Bantam Books*. In *Penthouse*, several public officials serving as members of the United States Attorney General's Commission on Pornography accused multiple major American companies of selling pornographic material. *Id.* at 1012–13. Pursuing their mission "to determine the nature, extent, and impact on society of pornography in the United States," the Commission sent letters to corporations such as Time Inc. and Southland Corporation (owner of the 7–Eleven chain) on Justice Department stationary. *Id.* The letters stated that "the Commission received testimony alleging that your company is involved in the sale or distribution of pornography. The Commission has determined that it would be appropriate to allow your company an opportunity to respond to the allegations prior to drafting its

18

final report section on identified distributors." *Id.* at 1013.

In response, Southland advised the Commission that it had "decided to stop selling adult magazines in light of the public concern about the effects of pornography," and it "urge[d] that any references to Southland or 7–Eleven be deleted from [the Commission's] final report." *Id.* (alternations in original). In arriving at this decision, Southland noted a telephone call to its Vice President from a member of the Commission, who stated that the content of *Playboy* and similar magazines was "linked to child abuse" and that the Commission intended to comment about this link in its published report. *Id.*

Playboy Enterprises, Inc. and Penthouse International Ltd. then filed lawsuits (later consolidated) seeking to (1) permanently enjoin the Commission from disseminating what they termed a "blacklist" to censor or suppress their magazines, and (2) obtain money damages for a deprivation of their First Amendment rights. *See Playboy Enters., Inc. v. Meese*, 746 F. Supp. 154, 155 (D.D.C. 1990), *aff'd sub nom. Penthouse*, 939 F.2d 1011. After the district court granted the defendants' summary judgment motions on both claims, Penthouse appealed, and the D.C. Circuit assessed the Commissions' letters under the holding of *Bantam Books*. *See Penthouse*, 939 F.2d at 1014–15. The court concluded that, unlike in *Bantam Books*, the letters "contained no threat to prosecute, nor intimation of intent to proscribe the distribution of the publications." *Id.* at 1015 ("It may well be that the Commission came close to implying more authority than it either had or explicitly claimed. Nevertheless . . . we do not believe that the Commission ever threatened to use the

coercive power of the state against recipients of the letter." (citation omitted)).

So too here. The City's first sentence acknowledges its lack of authority to restrict freedom of speech or to direct private businesses about which events they may host. *See* Appellant's App. at 8 ("The City of Colorado Springs does not have the authority to restrict freedom of speech, nor to direct private businesses like the Cheyenne Mountain Resort as to which events they may host.").

Next, VDARE points to the second sentence in the City's Statement to argue that the first sentence was a "covert veneer." Appellant's Opening Br. at 13. The second sentence states: "That said, I would encourage local businesses to be attentive to the types of events they accept and the groups that they invite to our great city." Appellant's App. at 8. We agree with the district court that this sentence contains no threat and only expresses the City's views on the need for private businesses to pay attention to the types of events they accept and groups they invite. *See id.* at 88. Notably, this sentence doesn't name VDARE or express any "distaste" for VDARE's speech, as did the Council's letters to Citibank in *R.C. Maxwell*, stating that the billboards were "unsightly" and ill-suited to the Borough's aesthetic. 735 F.2d at 86.

VDARE next turns to the third sentence in the Statement: "The City remains steadfast in its commitment to the enforcement of Colorado law, which protects all individuals regardless of race, religion, color, ancestry, national origin, physical or mental disability, or sexual orientation to be secure and protected from fear, intimidation, harassment and physical harm." Appellant's App. at 8. VDARE contends that this too was a "thinly-veiled threat to prosecute VDARE and those who

20

cooperated with it" and that "Mayor Suthers' statement not only 'encourage[d]' pariah treatment for VDARE but exercised 'coercive power' to that end." Appellant's Opening Br. at 18–19.

We disagree. As with the first two sentences in the Statement, this sentence contains no plausible threat—let alone a threat of prosecution. It's a statement of Colorado law. As the district court concluded, it isn't analogous to the direct warnings and threats contained in the notices in *Bantam Books*. *See supra*, Discussion, Part I.A.2; *cf. Wolford v. Lasater*, 78 F.3d 484, 488 (10th Cir. 1996) ("In the context of a government prosecution, a *decision to prosecute which is motivated by a desire to discourage protected speech or expression* violates the First Amendment and is actionable under § 1983." (emphasis added) (citation omitted)).

Another case, *X-Men Security, v. Pataki*, 196 F.3d 56 (2d Cir. 1999) serves as a helpful comparator. There, a subsidized housing complex located in a crime-ridden part of New York City employed plaintiffs, X-Men Security, Inc., a private security company. *Id.* at 60. A majority of X-Men's employees were of "Black African American descent" and "followers of the Islamic Religion." *Id.* (citation omitted). Questioning the propriety of employing X-Men under a government contract, two New York politicians campaigned to prevent the housing complex from renewing its contract with X-Men. *Id.* at 61–62. In a letter they wrote to the housing commissioner, they "accused [X-Men] . . . of hating Jews, women, Catholics and others." *Id.* at 61. They added that awarding X-Men a contract would "subsidize[] the

21

activities of a hate group and help[] fund the racist and anti-Semitic goals of Louis Farrakhan and the Nation of Islam." *Id.*

Facing this pressure, the housing complex terminated X-Men's month-to-month contract, awarding it instead to a company that hadn't even submitted a bid. *Id.* at 62 (citation omitted). X-Men then sued a host of defendants, including New York State officials, asserting claims based on freedom of religion and association, due process, and equal protection. *Id.* Though the district court partially dismissed the complaint, it kept alive the First Amendment retaliation claim against the officials. *Id.* at 63.

The Second Circuit unanimously reversed the district court's First Amendment retaliation ruling. *Id.* at 72. Assessing whether the language in the letter could color a First Amendment claim, the court concluded that "the legislators were not the decisionmakers" and had "no power to control the award of contracts." *Id.* at 68. So even though the letter accused X-Men of being part of a "hate group" and practicing racism, the court concluded that it wasn't threatening. *Id.* at 71 ("We see neither in this letter nor in any of the other allegations of the complaint any semblance of threat, coercion, or intimidation by the legislators."). The same is true here. The City made clear that it lacked any power to control the Resort's events.

Finally, VDARE points to the fourth sentence in the Statement, which states that the City "will not provide any support or resources to this event, and does not condone hate speech in any fashion." Appellant's App. at 8. This, VDARE argues,

22

encouraged "a heckler's veto." *Id.* at 20.[2] Moreover, VDARE argues that the surrounding circumstances—including the "natural import" of the Statement, its timing, and basic fairness—show that the Resort cancelled the Conference *because* of the Statement and its lack of "reassurance that the City would protect [its] properties and keep the peace." *Id.* at 20–23. We disagree with VDARE that this is a plausible interpretation of the last line of the City's Statement.

First, the "surrounding circumstances" included the violent protests that occurred in Charlottesville only three days before the Resort's cancellation. *See supra*, Background, Part I. VDARE's allegations don't acknowledge that the Resort may have cancelled its contract after observing news coverage of that event. This likelihood matters because under *Iqbal*, we can't infer that the Resort's cancellation is attributable to the City based on just the possibility of its being so. *Iqbal* provides that it isn't sufficient for a plaintiff to plead facts that are "merely consistent with" a defendant's liability and that such facts "stop[] short of the line between possibility and probability." 556 U.S at 678 (quoting *Twombly*, 550 U.S. at 557).

Indeed, the circumstances in this case are reminiscent of a case in which a New York City public official sent letters to department stores critiquing a satirical boardgame at a time that coincided with public controversy over the subject of the game. *See Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983). In

---

[2] A "heckler's veto" is "[t]he government's restriction or curtailment of a speaker's right to freedom of speech when necessary to prevent possibly violent reactions from listeners." *Heckler's Veto*, *Black's Law Dictionary* (11th ed. 2019).

*Hammerhead*, the Human Resources Administrator of New York City had urged several department stores to refrain from carrying a board game named "Public Assistance—Why Bother Working for a Living." *Id.* at 34–37. The Administrator sent at least thirteen national department stores a letter on official stationery urging them not to carry the game. *Id.* at 36–37. The letters stated that "[b]y perpetuating outdated myths, . . . [the] game does a grave injustice to taxpayers and welfare clients alike." *Id.* at 36 n.2. It concluded: "Your cooperation in keeping this game off the shelves of your stores would be a genuine public service." *Id.*

After several department stores stopped carrying the game, the game's creators sued the Administrator, the Mayor, and several New York City entities, alleging that the letter violated their First Amendment rights and was libelous, defamatory, and tortiously interfered with contractual relations. *Id.* at 38. The Southern District of New York disagreed and ruled that "the letter was not censorship; it was an appeal to conscience and decency." *Hammerhead Enters., Inc. v. Brezenoff*, 551 F. Supp. 1360, 1370 (S.D.N.Y. 1982), *aff'd*, 707 F.2d 33. The Second Circuit affirmed, reasoning that the letter was "nothing more than a well-reasoned and sincere entreaty in support of [the public official's] own political perspective." *Hammerhead*, 707 F.2d at 38. And it concluded that despite the letters and other similar pressure tactics aimed at specific stores, the subsequent "decision to cancel [selling the game] . . . may have been spurred by the continuing controversy in the press or by business reasons wholly unrelated to the . . . letter." *Id.* at 37.

24

Here too, VDARE's Conference subjects overlapped with worrisome events to a business owner. So absent factual allegations that the Resort cancelled the Conference because the Resort felt that the City had *directed* it to do so, VDARE hasn't plausibly alleged that the Resort's conduct was state action.

Second, VDARE speculates that regardless of what future circumstances would have unfolded, the City would have allowed the "breakdown of law and order." Appellant's Opening Br. at 20. But VDARE hasn't plausibly alleged that the City was declaring that it would not intercede with police or fire personnel if faced by the mayhem that VDARE envisions. That's just its subjective interpretation, and an implausible one too. What VDARE wanted, it had no right to demand—municipal resources to monitor a private entity's private event.

Third, VDARE doesn't plausibly allege that the Statement was *significantly* encouraging or coercive. VDARE doesn't allege that the City followed up on its Statement with any actions. This too contrasts with *Bantam Books*, in which the Commission followed up on its threatening notices with visits from police officers so that distributors "reasonably understood" that they had to comply with the notices. 372 U.S. at 68; *see also Hammerhead*, 707 F.2d at 37 (finding no coercion or censorship present where the Administrator "took no further steps to trace the consequences of his correspondence," "did not investigate whether any merchants were in fact carrying the game," and did not "contact any government agency which might have regulatory power over [the] department stores." (footnote omitted)). Indeed, the threat of imposing criminal sanctions, and how it was continually

25

reinforced, is what led the Supreme Court in *Bantam Books* to conclude that the Commission's tactics amounted to a state-sponsored system of prior restraints. *See* 372 U.S. at 68–69.

And fourth, as noted, nothing in the Amended Complaint plausibly alleges that the City used its power to *control* the Resort's independent decision-making process. *See X-Men*, 196 F.3d at 68, 71 (explaining that the public officials who sent letters criticizing X-Men didn't violate the First Amendment when they had "no power to control the award of contracts" and only exerted "pressure" in the form of speech).

In sum, the allegations don't show that the City ever threatened or ordered the Resort to take any action akin to what the Commission did to distributors in *Bantam Books*. Nor does it allege that the City sent police officers to intimidate anyone as in *Bantam Books*.[3] Likewise, VDARE hasn't pleaded that the Resort and the City were intertwined through regulatory, administrative, financial, or contractual regimes, such as those discussed in *Blum* and its progeny or in *Gallagher*, which could have given the City direct influence over the Resort. As well, VDARE's allegations don't compare to the facts in *R.C. Maxwell*, *Hammerhead*, *X-Men*, or *Penthouse*, cases in which a government official directly communicated with a private third party in an effort to pressure that party to take a specific action.

---

[3] Similarly, VDARE's reliance on *Marcus v. McCollum*, 394 F.3d 813 (10th Cir. 2004), is misplaced. That case also involved the physical presence of police officers, who told plaintiffs that they would "go to jail" if they didn't keep their "mouth[s] shut." *Id*. at 817 (citation omitted).

In sum, we agree with the district court that "for unconstitutional state action to exist, state law must direct and/or state agencies and officials must commit conduct that directly violates a party's [F]irst [A]mendment rights." Appellant's App. at 92. The City didn't engage in such conduct here. Thus, we conclude that VDARE hasn't plausibly alleged that the Resort's cancellation of the Conference was state action.[4]

## B.     Government Speech

Having concluded that the Resort's decision to cancel the Conference doesn't plausibly constitute state action, we now turn to VDARE's second argument—that the City's Statement itself violated VDARE's First Amendment rights. On this issue, the district court ruled that the City's Statement was "permissible government speech" and that Defendants were "entitled to speak for themselves [and] express their own views, including disfavoring certain points of view." *Id.* at 88.

VDARE argues that the district court "insulated" the City's Statement from a

---

[4] This section of VDARE's Amended Complaint also alleges that Defendants' actions violated its "rights to . . . equal protection of the laws as guaranteed by the Fourteenth Amendment." Appellant's App. at 11. The magistrate judge recommended dismissing this claim due to VDARE's "cursory" pleading. *Id.* at 45–46. Neither party objected, and the district court adopted the Recommendation. On appeal, VDARE makes a single passing reference to equal protection, stating that "[w]hen a First Amendment and equal protection claim are intertwined, the First Amendment provides the proper framework for review of both claims." Appellant's Opening Br. at 30 (citations omitted). This perfunctory mention of equal protection doesn't present a proper argument on appeal. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived." (citations omitted)). If anything, VDARE's statement is a concession that it isn't raising a separate equal protection argument requiring separate analysis. Thus, we don't further address it.

First Amendment challenge by characterizing it as a "neutral expression of government policy." Appellant's Opening Br. at 23. As before, it adds that "[t]he Mayor's words were less a 'statement' than a thinly veiled threat" that were "directed specifically at VDARE," and the words had the distinctive features of "adjudication," such as "accusing and then convicting VDARE of hate speech," and then "imposing the punishment of pariah status and withdrawal of municipal resources." *Id.* at 23–24 (citation omitted).

Defendants first counter that VDARE waived or forfeited its challenge to the district court's ruling on this issue by first raising it on appeal. They also argue that the district court properly applied the government-speech doctrine, under which a government may "interject its own voice into public discourse" and participate in the "marketplace of ideas." Appellees' Response Br. at 20–21. We address each argument in turn.

### 1.    Waiver or Forfeiture

The City argues that VDARE has waived or forfeited its challenge to the district court's government-speech analysis. VDARE responds that the government-speech doctrine "appeared, more or less *sua sponte* . . . in the District Court's decision." Appellant's Reply Br. at 14–15. And, it explains, when a district court independently rules on an unraised issue, "the appellant may challenge that ruling on appeal on the ground addressed by the district court." *Id.* at 15 (quoting *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991–92 (10th Cir. 2019)).

28

We agree with VDARE. "[W]aiver is the intentional relinquishment or abandonment of a known right," which "comes about when a party deliberately considers an issue and makes an intentional decision to forego it." *Tesone*, 942 F.3d at 991 (alteration in original) (citations omitted). And forfeiture occurs when an appellant presents an argument on appeal that "simply wasn't raised before the district court." *Id.* (citation omitted). The forfeiture rule, however, doesn't apply "when the district court explicitly considers and resolves an issue of law on the merits" because "[a]ppellate courts can reach issues that were . . . 'passed upon' by[] the lower court." *Id.* at 991–92 (first alteration in original) (citations omitted). "[A] court 'passes upon' an issue when it applies 'the relevant law to the relevant facts.'" *Id.* at 992 (citation omitted).

Here, VDARE neither waived nor forfeited its argument on government speech. It didn't waive this argument because nothing shows that VDARE ever "intentionally relinquished" its position on it. Quite the opposite. Because the Recommendation didn't address whether the Statement itself was permissible speech, VDARE objected to the Recommendation.

As to forfeiture, though VDARE didn't present its current government-speech argument to the district court, the issue came to the fore only in the district court's ruling. So while the City is right that VDARE didn't "ask the district court to reconsider its ruling" under Fed. R. Civ. P. 59(e), Appellees' Answer Br. at 18, the forfeiture rule doesn't apply when, as here, the district court "passe[d] on" the issue by applying the relevant law to the facts of this case. *Tesone*, 942 F.3d at 992

(citation omitted).

Having said that, our review "is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue." *Id.* (citing *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003)). Here, that standard of review is de novo because the district court held that VDARE didn't plausibly plead a First Amendment claim based on the City's Statement, and we "review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Gee*, 627 F.3d at 1183 (citation omitted). With this standard established, we now address the merits of the parties' government-speech argument.

### 2.    The Statement is Government Speech

VDARE first argues that "the District Court never articulated the three-factor test set forth by the Supreme Court; it simply asserted, as a bald conclusion, that the Mayor's threat was protected by the government speech doctrine." Appellant's Opening Br. at 26. We disagree.

To determine whether certain communication is government speech, we assess the following: (1) whether the forum has historically been used for government speech; (2) whether the public would interpret the speech as being conveyed by the government; and (3) whether the government has maintained control over the speech. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–10 (2015) (citation omitted). Though the district court didn't articulate the three *Walker* factors, neither party disputes that the City's Statement satisfied them: (1) it was delivered as government speech; (2) it was perceived as being conveyed by the

30

government; and (3) it was controlled by the government. *See id.*

### 3.    Viewpoint Neutrality

VDARE's second argument on this issue is that the district court erred by seeking to characterize the Statement as "a neutral expression of government policy" rather than as a "thinly veiled threat." Appellant's Opening Br. at 23. Threats, it argues, are not constitutionally protected speech.

On this, we note that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (citations omitted). This is because "[a] government entity has the right to 'speak for itself.'" *Id.* (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). "[I]t is entitled to say what it wishes," *id.* at 467–68 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)), "and to select the views that it wants to express," *id.* at 468 (citations omitted); *see also Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view . . . ."). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Summum*, 555 U.S. at 468.

The doctrine goes so far as to hold that "[w]hen the government speaks, . . . it is constitutionally entitled to make 'content-based choices,' and to engage in 'viewpoint-based funding decisions.'" *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1139 (10th Cir. 2001) (citations omitted). Hence, in *Rust v. Sullivan*, 500 U.S.

31

173 (1991), the Supreme Court held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193. In so doing, it explained, "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.*; *see also Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." (citation omitted)). At the same time, "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828 (citation omitted). That is, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another" or "[d]iscriminat[e] against speech because of its message." *Id.* (citations omitted).

Before addressing whether the City's Statement was plausibly threatening, we note that the district court never ruled that the City's Statement was "a neutral expression of government policy." Rather, it stated that "Defendants are entitled to speak for themselves, express their own views, including disfavoring certain points of view" and that "Defendants merely expressed themselves and their views on the need for private local businesses to pay attention to the types of events they accept and the groups that they invite to their City." Appellant's App. at 88.

This isn't the same as ruling that the Statement was "neutral." The district court acknowledged that the Statement expressed at least one view—that businesses

32

should be attentive about whom they invite to the City. But whether one finds the Statement "neutral" or not doesn't matter because, as discussed, government speech need not be so. Indeed, this core principle, that the government can have views and take strong positions—which it can express through various forms of speech—is at the heart of government-speech doctrine. *See Walker*, 576 U.S. at 207 ("[G]overnment statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas . . . . Were the Free Speech Clause interpreted otherwise, government would not work." (citation omitted)). Having concluded that the City's Statement didn't need to be neutral, we address VDARE's argument that it was unconstitutional as a "thinly veiled threat." Appellant's Opening Br. at 23.

VDARE argues that the City's Statement was a "thinly veiled threat" and that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Id.* (quoting *Watts v. United States*, 394 U.S. 705, 707 (1969)). VDARE argues that the Statement was a threat because it "had the distinctive features of an adjudication, accusing and then convicting VDARE of practicing hate speech, then imposing the punishment of pariah status and withdrawal of municipal resources." *Id.* But VDARE doesn't explain why the Mayor's words were a threat, especially when the Statement was neither directed at VDARE nor involved municipal resources to which VDARE has shown it was entitled. And the City's Statement is unlike the speech at issue in VDARE's cited cases, for instance those cases in which courts assessed threats to the United States President's life, *Watts*, 394 U.S. at 708, and

33

threats to use violence against government officials, *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1168 (10th Cir. 2009).

Nor does VDARE explain how the Statement had "the distinctive features of adjudication." Presumably, VDARE is invoking the discussion from *Bantam Books* in which the Supreme Court concluded that the Commission's system functioned as a system of prior restraints because the Commission could effectively ban publications for purchase without using any judicial processes. *See* 372 U.S. at 70–71. For example, the Court there noted that the Commission didn't provide notice, an opportunity to be heard, or a means for judicial review of publications it listed as "objectionable." *See id.* The instant situation isn't comparable. The City never formally banned VDARE from expressing a single view as the *Bantam Books* Commission did through its statutory mandate. *See id.* Moreover, we've already explained why we agree with the district court that nothing in the City's Statement was plausibly a threat, order, mandate, or exercise of control over a private entity's decision-making process. *See supra*, Discussion, Part A.2.

In sum, the Statement didn't plausibly exceed the bounds of constitutionally permissible speech by threatening the Resort. *See Penthouse*, 939 F.2d at 1016 ("[W]e know of no case in which the [F]irst [A]mendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content." (alteration in original) (citation omitted)); *X-Men*, 196 F.3d at 71 (concluding that legislators' allegedly discriminatory and false statements in letters were themselves protected speech because "[w]hat the legislators [were]

34

alleged to have done [was] to express their views. The only concrete acts ascribed to them [were] attending meetings, making statements, and writing letters."); *Hammerhead*, 707 F.2d at 35 (explaining that when an individual chooses to engage in speech that elicits a reaction, it can't use the First Amendment as both a shield and sword: "The right to free speech guarantees that every citizen may, without fear of recrimination, openly and proudly object to established government policy. It does not immunize the challengers from reproach.").

## II.    First Amendment Retaliation Claim

VDARE's second claim is for First Amendment retaliation. Specifically, VDARE alleges that the City's intent to retaliate against it is evinced by the part of the Statement that characterizes VDARE's speech as "hate speech" and the part that urges local businesses to "be attentive to the types of events that they accept and groups they invite." Appellant's App. at 18. VDARE further claims that in stating that the City wouldn't provide any support or resources for the event, the City intended to "chill a person of ordinary firmness from continuing to engage in . . . constitutionally protected activity." *Id.* Finally, VDARE claims, because of the City's "expressed disapproval of [VDARE's] speech and [its] expressed intention to take action against [VDARE's] speech, [it] has not attempted to arrange another conference to engage in such activity in Colorado Springs." *Id.*

To state a claim for First Amendment retaliation, a plaintiff must allege (1) that it was engaged in constitutionally protected activity, (2) the defendant's actions caused it to suffer an injury that would chill a person of ordinary firmness from

35

continuing to engage in that protected activity, and (3) the defendant's actions were substantially motivated as a response to [its] protected conduct. *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (citations omitted). Of these, the second element—the "person of ordinary firmness" element—is a "vigorous standard." *Eaton v. Meneley*, 379 F.3d 949, 956 (10th Cir. 2004) (citation omitted). Not only is it assessed objectively, but it is also "substantial enough that not all insults in public debate become actionable under the Constitution." *Id.* (citation omitted).

The district court dismissed this claim, concluding that VDARE's speculations and conclusory allegations didn't plead a plausible claim. Specifically, it concluded that VDARE's "deficient allegations" were "insufficient to establish the second element of its retaliation claim" because "VDARE's conclusory and speculative allegations [were] insufficient to show a causal connection between Defendants' Statement and Cheyenne Resort's cancellation of the Conference."  Appellant's App. at 98. Because the district court found that VDARE had not plausibly alleged the second element, it didn't address the other elements. *Id.*

We similarly conclude that VDARE hasn't plausibly alleged that the City's actions caused it to suffer an injury that would chill a person of ordinary firmness from continuing to engage in protected activity. The majority of VDARE's "factual allegations" on this claim aren't facts, but unsupported conclusions. As an example, VDARE states: "Defendants' actions have made it impossible for VDARE to conduct future conferences, discussions and events in Colorado Springs, as Defendants have made clear their position that VDARE, its sponsors and other associated individuals

36

enjoy a disfavored status under the law." *Id.* at 18–19. This is a conclusion. It doesn't explain why, as a factual matter, it became "impossible" for VDARE to conduct future conferences at other venues in Colorado Springs or how VDARE now experiences a "disfavored status under the law." Likewise, though VDARE alleges that it wouldn't have been provided city services if it "attempted to host a conference or other gathering in the City," this too is speculation. *See id.* VDARE cannot expect us to assume that it enjoys a "disfavored status under the law" absent factual allegations suggesting, for example, that another entity received such resources.

In short, we find VDARE's Amended Complaint to be filled with legal conclusions rather than facts from which these conclusions plausibly flow. But "naked assertion[s] devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (alteration in original) (internal quotation marks and citation omitted), do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation and footnote omitted). Because many of VDARE's causation claims "are no more than conclusions, they aren't entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

Even so, VDARE argues that it has satisfied the causation element by alleging that "[t]he Mayor singled out VDARE for invidious treatment and condemned it for promoting 'hate speech' . . . pursuant to an official 'Hate Speech' policy." Appellant's Opening Br. at 29. We disagree. The Statement didn't mention VDARE, and VDARE hasn't alleged that the City ever communicated with it or the Resort or treated it differently than groups with different speech content, such that it was "singled out." Again, the court cannot just adopt VDARE's subjective interpretation

37

of the Statement. *See McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 905 (10th Cir. 2002) ("Both sides mistakenly assume the 'chill' standard is subjective, which it is not." (citation omitted)).

Next, VDARE argues that it plausibly alleged causation because "[i]n his long list of those whom he would protect—'all individuals regardless of race, religion, color, ancestry, national origin, physical or mental disability, or sexual orientation'— [the Mayor] pointedly omitted those who engaged in dissident speech." Appellant's Opening Br. at 29. But this too is just a subjective interpretation of a sentence that simply relays Colorado law and doesn't exclude anyone.

Finally, VDARE argues that "[a]s a result of the Mayor's threat, the Cheyenne Resort cancelled VDARE's conference because it knew full well, as anyone would, that it could not cope with violent protesters without the benefit of basic police protection." *Id.* But the Amended Complaint lacks even one sentence providing the factual reason that the Resort gave VDARE for cancelling its contract—something that VDARE would surely know.

Indeed, all agree that the Resort cancelled the contract three days after what VDARE describes as "the pandemonium and violence that had washed over Charlottesville, Virginia." *Id.* at 6. Even if the Resort *possibly* cancelled the contract in part due to the Statement doesn't mean that VDARE has *plausibly* pleaded allegations that the Resort was compelled to do so at the City's behest, as is required for a constitutional violation. *See supra*, Discussion, Part I.A. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted

38

unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

The only alleged fact that arguably supports a showing of causation is the temporal proximity of the Resort's cancelling the contract and the City's issuing the Statement. But that lone allegation doesn't alter our conclusion for several reasons. First, as noted already, VDARE must allege more than that the Statement possibly *influenced* a third party's business decision, which as we have discussed, government speech may do. *See, e.g.*, *R.C. Maxwell*, 735 F.2d at 89 ("We conclude that [a private third party's] desire to create a receptive climate for any future [business] plans does not rise to the level of state-coerced action.").

Second, "mere temporal proximity" is "insufficient, without more," to establish the elements of retaliation. *Baca v. Sklar,* 398 F.3d 1210, 1221 (10th Cir. 2005) (citation omitted). Here, VDARE's need for additional factual allegations is particularly critical because though there is proximity between when the Statement was issued and when VDARE was allegedly chilled in exercising its speech, the occurrence of deadly protests in Charlottesville, which made national headlines and likely affected local businesses' decisions, occurred contemporaneously. *Cf. Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) ("[E]vidence of intervening events . . . tend to undermine any inference of retaliatory motive and weaken the causal link.").

Third, as demonstrated by *R.C. Maxwell* and other similar circuit decisions, the City's Statement is itself protected speech that must be egregious to be plausibly retaliatory. In *Suarez Corp. Industries v. McGraw*, the Fourth Circuit concluded that when the alleged retaliatory act is public speech, the bar for finding retaliation is elevated because "there is an interest in having public officials fulfill their duties," and "a public official's own First Amendment speech rights are implicated." 202 F.3d 676, 687 (4th Cir. 2000).

This high bar for retaliation is consistent with our precedent. For example, in *Eaton*, we held that a sheriff's running criminal-background checks against those who petitioned to remove him from office wasn't retaliation. 379 F.3d at 956. We explained that "the nature of political debate is rough and tumble," and "Plaintiffs in public debates are expected to cure most misperceptions about themselves through their own speech and debate." *Id*. Similarly, in *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, we found no retaliation when a board of trustees censured one of its members by publicly announcing that she had violated its ethics policy. 235 F.3d 1243, 1247–48 (10th Cir. 2000). There, we reiterated that "the government may . . . interject its own voice into public discourse," and that "[t]he crucial question is whether, in speaking, the government is *compelling* others to espouse or to suppress certain ideals and beliefs." *Id.* at 1247 (citations omitted)).

Here, VDARE hasn't plausibly alleged that the City's issuing the Statement alone prevented VDARE from expressing its views. At all times, VDARE remained "very much free to express [its] views publicly." *Eaton*, 379 F.3d at 956 (internal

quotation marks and citation omitted). Accordingly, VDARE has not alleged a plausible First Amendment retaliation claim.

## III.    Qualified Immunity

In addition to the City of Colorado Springs, VDARE filed suit against Mayor John Suthers in his individual capacity. The Mayor claims that he is entitled to qualified immunity. We agree.

"In resolving a motion to dismiss based on qualified immunity, the court considers (1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (citations and internal quotation marks omitted). Because it's the plaintiff's burden to satisfy this "strict two-part test," we may grant qualified immunity if a plaintiff fails under either prong. *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010) (citation and internal quotation marks omitted). We review de novo the district court's grant of qualified immunity. *See Keith*, 707 F.3d at 1187.

Because we conclude that VDARE hasn't plausibly alleged a constitutional violation against any of the defendants, VDARE can't meet its burden on the first prong. As a result, we needn't reach the second prong regarding clearly established law. *Hesse v. Town of Jackson*, 541 F.3d 1240, 1244 (10th Cir. 2008) ("If the court concludes no constitutional right has been violated, no further inquiry is necessary and the defendant is entitled to qualified immunity."). Accordingly, we conclude that Mayor Suthers is entitled to qualified immunity on those claims.

41

## IV.    Intentional Interference with Contract

VDARE's final claim is a state tort claim for intentional interference with contract. Recognizing that "[f]ederal courts are courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), the district court declined to exercise supplemental jurisdiction over this claim. Since we too conclude that VDARE didn't plausibly plead any federal claims, we decline to exercise supplemental jurisdiction over this claim. *See Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (citations omitted)).

## CONCLUSION

For the foregoing reasons, we affirm.

**20-1162 – VDARE Foundation v. City of Colorado Springs, et al.**

**HARTZ, J.**, Circuit Judge, dissenting

I respectfully dissent.  In my view the Complaint adequately alleges that the City, because it objected to the views of VDARE, intentionally caused the Cheyenne Mountain Resort to cancel the reservations for the VDARE conference.

I agree with so much of the panel majority opinion that my dissent can be brief. My difference with the majority centers on the import of the third sentence of Mayor Suthers's announcement:  "The City of Colorado Springs will not provide *any* support or resources to this event, and does not condone hate speech in any fashion."  Aplt. App. at 8 (emphasis added).

The Supreme Court opinion in *Ashcroft v. Iqbal* instructs us to use our "judicial experience and common sense" in assessing whether a complaint states a plausible claim. 556 U.S. 662, 679 (2009).  In this case the first step of that process is to construe the Mayor's sentence.  The most reasonable, perhaps the only reasonable, construction is that the sentence conveyed, and was intended to convey, that no police or fire protection would be provided for the VDARE conference at the Resort.  What other "support or resources" would the City ordinarily provide?  As counsel for VDARE stated at oral argument, "What else could the Mayor be conveying?"  Oral Arg. at 7:23–25.  And, according to specific allegations in the Complaint, that is how the public interpreted the Mayor's statement.  One television station allegedly reported, "Colorado Springs Mayor won't commit city assistance to upcoming white nationalist conference," and said that the

local sheriff's office announced that its "deputies would not be participating *either* unless their presence is requested by the Colorado Springs Police Department for some reason." Aplt. App. at 9 & n.2 (emphasis added). Certainly, at this stage of the proceedings we should adopt that interpretation in determining whether the Complaint states a cause of action. This interpretation is not merely "consistent with" the Mayor's language; I question whether any other interpretation would be plausible.

Defendants contend that this statement by the Mayor was merely an expression of a particular point of view, which is protected from liability as government speech. Under the government-speech doctrine, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). The doctrine is usually invoked when the question is whether the control that the government exercises over a particular forum (in *Walker*, license plates) constitutes government regulation of private speech (which cannot discriminate on the basis of content) or is no more than the government determining what content it wishes to convey itself. *See, e.g.*, *id.* at 206–07. There is no violation of the First Amendment protections of free speech when the government favors particular content, or even a particular viewpoint, so long as it is the government that is speaking. *See, e.g.*, *id.* at 219–20.

But the government-speech doctrine does not create an immunity for whatever the government chooses to say. For example, "the Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Id.* at 208. And if the government cannot seek to

2

*compel* favored speech, it surely cannot *punish* or seek to *deter* speech based on its (constitutionally protected) content or viewpoint. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61–63 & n.5 (1963) (state decency commission notified magazine and book distributors that it had found particular publications to be objectionable for sale and noted that it could recommend obscenity prosecution to the attorney general); *cf. Chernin v. Lyng*, 874 F.2d 501, 502–03, 506–08 (8th Cir. 1989) (employee of meatpacker entitled to due-process hearing even though firing was by private employer, since government told employer it would have to fire employee to obtain government inspection services).

A government effort to punish or deter disfavored speech is what VDARE adequately alleges. And the City accomplished its purpose. The Complaint plausibly alleges that the Mayor's statement caused the Resort to cancel the VDARE conference. The majority opinion opines that the statement was not "*significantly* encouraging or coercive." Maj. Op. at 25. I must respectfully disagree. I would think that most businesses would be strongly inclined to forgo a customer if they were told that they would lose police and fire protection if they did business with the customer. And the Mayor's announcement did much more. It implicitly invited violence. It is one thing to refuse to provide police protection. It is quite another to announce far in advance that police protection will not be provided. VDARE espouses views that many find highly obnoxious. Any of its activities could engender protests, counter-protests, and clashes between the two sides. The Complaint alleges that VDARE has never espoused violence. Assuming that to be true, as we must in considering a motion to dismiss, the Resort would have little reason to fear violence from hosting a VDARE conference. After all,

3

the Resort is on private property. It has no obligation to allow protesters on its grounds. Barring access to protesters should suffice to keep the peace. But an announcement that there would be no law-enforcement presence is an open invitation to those inclined to violence, as protesters, counter-protesters, or whatever.

The majority opinion raises the possibility that the Resort canceled its contract with VDARE because of the recent violence in Charlottesville, saying that VDARE's nexus argument is not plausible because it has not excluded that possibility. But I would think it more plausible that the Charlottesville violence enhanced the coercive force of the Mayor's announcement by highlighting the danger to the Resort from the denial of police protection, particularly when that denial is publicly announced in plenty of time for bad actors to make plans. Besides, if it was so likely that the Resort would cancel its plans because of what happened in Charlottesville, why would the Mayor bother making an unnecessary announcement regarding an event that would not be occurring?

The majority opinion also appears to fault VDARE for not including in the Complaint any excuse given by the Resort for canceling the contract. But VDARE should not be bound by an unsworn statement by the Resort when the Resort may have various interests in being less than candid. I am not suggesting that VDARE has definitively proved the necessary nexus. But I would say that the Complaint makes a more than plausible claim of nexus.

For similar reasons, VDARE's First Amendment retaliation claim is also plausible. I would think it beyond debate that a person of ordinary firmness would be chilled from speaking if he could not depend on first responders protecting him from

4

violence.  We have recognized that "allegations of physical and verbal intimidation, including a threat by a deputy sheriff to shoot" a speaker "would surely suffice under our precedents to chill a person of ordinary firmness from continuing" to exercise his First Amendment rights.  *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir. 2007); *see Perez v. Ellington*, 421 F.3d 1128, 1132 (10th Cir 2005) (holding that chill requirement was satisfied by rushed imposition of tax assessments and delay in removing tax liens after their abatement).  I do not join the majority in discounting to insignificance the effect on the Resort of the prospect of uncontrolled violence.

I should add, however, that I agree that the Mayor is entitled to qualified immunity.